UNITED STATES of America, Appellant,

v.

G. Richard SHAFTO, Appellee.

No. 7437.

United States Court of Appeals Fourth Circuit.

Argued June 4, 1957.

Decided July 15, 1957.

Melva M. Graney, Atty., Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack, I. Henry Kutz and Fred E. Youngman, Attys., Department of Justice, Washington, D. C., N. Welch Morrisette, Jr., U. S. Atty., and Irving F. Belser, Asst. U. S. Atty., Columbia, S. C., on brief), for appellant.

S. Augustus Black, Columbia, S. C. (McKay, McKay, Black & Walker, Columbia, S. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought by G. Richard Shafto, the taxpayer, to secure a refund of additional income taxes collected from him in the years 1944 to 1947. The taxes were assessed upon rents paid by lessees of a property owned by the taxpayer, and the question for decision is whether the rents were taxable to him or to his wife, who had received the rents under assignments of the leases and had reported them in her separate income tax returns. The taxpayer made the assignments with-

out consideration in order to minimize his income taxes and also to build up an estate for his wife. She used the rent money in part to buy another piece of property and in part to pay the premiums on an insurance policy which will provide an annuity for her when she reaches the age of fifty-five. All rentals were deposited in her separate bank account, free from control of the husband, and were expended for her individual purposes exclusive of her clothing, maintenance and support and exclusive of anything as to which the husband under a legal or moral duty would provide. There was no collusion or secret agreement between husband and wife under which he was to get any part of the rents that were payable under the leases.

The leases covered a two-story building and lot owned by the taxpayer at 3718–3720 Main Street, Columbia, South Carolina. The first floor and lot were leased to tenants for commercial use and the second floor, which was divided into two apartments, was leased to other tenants for residential purposes. By an indenture dated April 29, 1940, which was recorded in the office of the Clerk of the County Court, the taxpayer as owner of the property leased the first floor and adjoining lot to J. Drake Edens as a grocery store for a term of five years ending May 31, 1945, at a rental of $75.-00 per month. The taxpayer agreed in the lease to remodel and improve the ground floor and store front and to pay all charges for upkeep of the exterior of the building and structural defects. By indorsement this lease, together with all the rents derived therefrom, was transferred and assigned to the wife on July 21, 1941.

On the expiration of this lease a new lease was made on June 26, 1944, between the taxpayer as owner and a partnership of which Edens was a member, for the term of five years ending May 31, 1950, at the monthly rental of $85.00. This lease was also recorded in the office of the Clerk of the County Court and assigned by similar written indorsement to Mrs. Shafto on June 26, 1945.

During the term of this lease an addition was erected to the rear of the store, and the partnership, which in the meantime had been incorporated, agreed to a rental of $237.54 per month for a term of ten years. A new lease to this effect was executed between the taxpayer as lessor and the corporation as lessee under date of June 4, 1947, after Mrs. Shafto had been notified and had given her consent. This lease was also recorded in the office of the Clerk of the County Court and an assignment dated June 5, 1947, from the taxpayer to his wife was indorsed thereon in which "all rights as landlord including the within lease, together with all rents, profits, income and liabilities derived" therefrom were assigned to Mrs. Shafto.

Prior to the taxable period 1944 to 1947, written leases of the two apartments on the second floor were executed by an agent of the taxpayer as lessor and individual tenants as lessees for the term of one month at a rental of $17.50 per month. These leases were also assigned to the wife and recorded. Similar oral or written leases were executed and in effect during the taxable years and the rents were collected by the agent of the taxpayer and paid to the taxpayer's wife, but there was no recording of these leases and no written assignment, although the rents were handled as if both leases and assignments were in force.

It was stipulated that the assignments of the leases of the first floor of the property were irrevocable under the South Carolina law and it was held by the Judge that, under the statute of frauds § 11–101(4) of the South Carolina Code, the taxpayer retained the power to annul at will the assignments of the rents on the apartments on the second floor.

For the calendar year 1941 the taxpayer made federal gift tax returns in which he reported, among other gifts, the five-year lease dated May 29, 1940, which he valued at $3,600.00 as of June 1, 1941, with no gift tax due. No subsequent gift tax returns were made.

All the rents from the store property as well as the apartments were paid to the wife and reported in her separate income tax returns for the taxable years. In his separate returns for these years, the taxpayer claimed and was allowed deductions from gross income for depreciation, repairs, insurance, and county and city taxes paid with respect to the property. The Commissioner of Internal Revenue took the position that all of the rents should be charged as income to the taxpayer and accordingly assessed the additional taxes here involved, giving him credit for over-assessments of taxes resulting from the elimination of this income from his wife's returns.

The District Judge held that the rents from the apartments were chargeable to the taxpayer but that the rents from the first floor commercial property were taxable to his wife. The Judge was of the opinion that the wife acquired no practical control over the apartments because the leases were of uncertain duration and the taxpayer retained the power to annul the assignments of the rents at will; and hence he held that the transactions were nothing more than gifts of future income.

But with regard to the assignments of the leases on the store property he said:

"As to the first class of leases, those which were assigned in writing and were for a fixed duration, it is apparent that plaintiff assigned to his wife something more than a mere right to receive rents. The assignments gave her the status of landlady as to the lessees of the premises. It was she with whom they had to deal during the lease terms. The effect of each assignment was to create in her an estate for years in the premises. American Law Institute Restatement of Property, Section 19. She was, for all purposes, an intermediate lessee holding under plaintiff and over sub-lessees. She acquired a valuable property interest, and the rents which she received were the product of that property interest."

The Judge relied for this conclusion on the decision in Lum v. Commissioner, 3 Cir., 147 F.2d 356, where a similar decision was made.

■ In our view this conclusion is not tenable because the assignments of the leases on the store property actually conveyed nothing more than the right to receive the rents, and this is true whether we regard them as transfers of an interest in real property or as transactions affecting the liabilities of the parties in the realistic field of federal income taxation.

■ When the food store leases were executed the tenant became vested with a possessory estate for years in the property and the taxpayer-owner retained the reversion in fee to which the rents were attached as an incident.[1] It follows that when the taxpayer assigned the leases to his wife he was in no position to convey to her an estate for years during the term of the lease. He had the power to convey the entire reversion subject to the estate for years, which would have carried with it the right to the rents, or he could have conveyed the reversion and reserved the rents for himself, or he could have assigned the rents and reserved the reversion.[2] As a matter of fact he chose the last mentioned alternative.

■ It is the settled rule that when a lessor assigns a lease without mention of the reversion, only the right to the rents passes to the assignee, and although the transfer of a reversion will carry with it the rent as an incident, the transfer of the rent does not carry with it the reversion as an incident.[3] In this con-

1. See American Law of Property, Vol. 1, §§ 3.2 and 3.59 (1952) ; Tiffany, Real Property, Vol. 1, § 76 (3rd Ed.1939).

2. See American Law of Property, Vol. 2, § 9.45 (1952).

3. See American Law of Property, Vol. 2, § 9.45 (1952) ; Hunt v. Thompson, 2 Allen, Mass., 341; Demerest v. Willard, 8 Cow., N.Y., 206; Morehouse v. Woodruff, 218 N.Y. 494, 499, 113 N.E. 512.

nection Tiffany, in his exhaustive treatise on Landlord and Tenant, Vol. 1, § 146(b), makes the following pertinent comment.

"b. Transfer of a 'lease.' Not infrequently one finds a mention of the transfer or assignment of the 'lease' by the lessor, and occasionally this expression is used, apparently, as synonymous with a transfer of the reversion. Such expression can, it is submitted, properly be used only of a transfer by the lessee or his assignee, the word 'lease' being in such case used elliptically, as it is frequently used in other connections, to designate the estate created by the lease, the leasehold interest. The expression 'transfer of a lease', when used with reference to a transfer by the lessor, cannot well refer to a transfer of the estate in reversion, since such estate exists independently of the lease, though it is not reversionary in character until after the lease has been made, and the only meaning which could properly be attached to this mode of expression is a transfer by the lessor of the rights created in his favor by the lease, so far as they can exist independently of and apart from the reversion, the chief, and usually the only one of which, is that to rent. A transfer or assignment, when spoken of as the act of the reversioner, should therefore, it seems, ordinarily be regarded as meaning merely a transfer of the rent to become due, with perhaps any rights created by covenant on the part of the lessee looking towards the collection of the rent rather than the protection of the reversion, and the expression, at best one to be avoided owing to its ambiguity, is generally, it would seem, construed in this sense."

■ The taxpayer seeks to avoid this conclusion on the ground that under the South Carolina statute, South Carolina Code, § 10–207 (1952), every action must be prosecuted in the name of the real party in interest, and hence the assignee of the lease had the power to enforce its provisions by eviction, distress, and by an action of the recovery of the rents; but this statute does not change the nature of the interest which the assignee of a lease acquires. It is generally held that under a mere assignment of rents, the assignee becomes entitled to enforce all the covenants in the lease pertaining to the rents, even to the extent of bringing suit to enforce payment.[4] The effect of the statute was merely to clothe the owner of the rents with the power to collect them.

The same observation may be made with respect to the additional contention of the taxpayer that the express assignment to the wife in the last lease of all the rights as landlord, including the within lease, together with all the rents, profits, income and liabilities derived therefrom, gave the wife something more than the right to collect the rents. The taxpayer does not suggest what these additional rights were and we have been unable to discover them. It is generally held that the status of landlord attaches to the owner of the reversion and passes to an assignee when the reversion is assigned;[5] and it seems to be contended, conversely, that the transfer to the wife of the status of landlord implies the intent on the part of the taxpayer to convey some interest in the reversion to the assignee.

The undisputed facts of the case, however, completely dispel any such implication. The taxpayer agreed in the leases to remodel and improve the ground floor and store front and also to pay all charges for the upkeep of the exterior of the building and structural defects; and it appears that during the term of the second lease, which began June 1, 1945, the

4. See American Law of Property, Vol. 2, § 9.45 (1952); Pfaff v. Golden, 126 Mass. 402; Willard v. Tillman, 2 Hill., N.Y., 274; Moffatt v. Smith, 4 N.Y. 126; Hunt v. Thompson, 2 Allen, Mass., 341; Bowman v. Keleman, 65 N.Y. 598; Demerest v. Willard, 8 Cow., N.Y., 206.

5. See Tiffany, Real Property, Vol. 1, § 76 (3rd Ed.1939); Tiffany on Landlord and Tenant, Vol. 1, §§ 2, 146(a) and 148.

taxpayer caused an addition to be erected to the rear of the store, and a new lease at an increased rental for a term of ten years between the taxpayer and the occupants of the store was executed on June 4, 1947. The wife had notice of this change in the lease and gave her consent; but it nowhere appears that she contributed to the expense of the new building which undoubtedly was undertaken by the taxpayer as the owner of the reversion. Moreover, the wife undertook none of the responsibilities and liabilities incumbent upon the owner of the reversion and the landlord of the rented premises. During the term of the leases the taxpayer claimed in his income tax return and was allowed deductions for depreciation, repairs, insurance, and county and city taxes on the property covered by the leases. It is obvious that the parties intended that the wife should receive the revenues from the property, while the husband should undertake all liabilities for the improvement of the property and assume the payment of all current expenses and liabilities; and that in fact he claimed and received the benefit of the expenses in the latter category in the form of deductions from his taxable income.

■■ If any doubt should arise as to the technical rules of law governing the assignment of leases of real property, the same conclusion as to the taxpayer's liability in this case will be reached by approaching the problem from the field of federal taxation. In the general application of the Revenue Acts tax liability attaches to ownership; but a taxpayer may not escape the tax on his income by giving it away or assigning the right to receive it in advance of payment, Helvering v. Horst, 311 U.S. 112, 116, 118–119, 61 S.Ct. 144, 85 L.Ed. 75. The validity of such an assignment is for the state courts to decide, but whether the assignor is still taxable upon the income is a federal question under the Federal Income Tax Act, Blair v. Commissioner, 300 U.S. 5, 11 and 12, 57 S.Ct. 330, 81 L.Ed. 465; and in deciding this question the courts are governed by realities rather than by the "attenuated subtleties" of the law of property. Harrison v. Schaffner, 312 U.S. 579, 581, 61 S.Ct. 759, 85 L.Ed. 1055.

Thus in Blair v. Commissioner, supra, the income from a trust estate was held to be taxable to the assignee of the beneficiary because it comprised all the net income to which the assignor was then entitled or might thereafter be entitled to receive from the trust during his lifetime, so that in effect the assignment transferred his entire equitable interest in the corpus of the property. But in Helvering v. Horst, supra, it was held that the income from interest coupons detached from bonds and delivered as a gift to the son of the taxpayer before they were due were taxable to the donor because the dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it, and one who possesses and exercises the power to procure payment of income to another has the enjoyment of the income himself; and in Harrison v. Schaffner, supra, the same course was followed where the life beneficiary of a trust assigned to her children portions of the income of the trust for the year following the assignment.

Again, in Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898, the taxpayer was held liable for the tax on royalties derived from license agreements under a patent, which he had assigned to his wife. The Court said, 333 U.S. at page 604, 68 S.Ct. at page 722:

"It is the taxpayer's contention that the license contracts rather than the patents and the patent applications were the ultimate source of the royalty payments and constituted income-producing property, the assignment of which freed the taxpayer from further income tax liability. We deem it unnecessary however, to meet that contention in this case. It is not enough to trace income to the property which is its true source, a matter which may become more metaphysical than legal. Nor is the

tax problem with which we are concerned necessarily answered by the fact that such property, if it can be properly identified, has been assigned. The crucial question remains whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes. As was said in Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916, 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid.' "

It is plain that the transactions under examination are of the same general character as those in the well known decision of Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, which has been followed in a variety of circumstances in a long line of decisions in this and other federal courts. They are well characterized in the following quotation from Commissioner of Internal Revenue v. Sunnen, supra, 333 U.S. at page 605, 68 S.Ct. at page 723:

"It is in the realm of intra-family assignments and transfers that the Clifford-Horst line of cases has peculiar applicability. While specifically relating to short-term family trusts, the Clifford case makes clear that where the parties to a transfer are members of the same family group special scrutiny is necessary 'lest what is in reality but one economic unit be multiplied into two or more by devices which, though valid under state law, are not conclusive so far as § 22(a) is concerned.' 309 U.S. at page 335, 60 S.Ct. at page 556. That decision points out various kinds of documented and direct benefits which, if retained by the transferor of property, may cause him to remain taxable on the income therefrom. And it also recognizes that the fact that the parties are intimately related, causing the

income to remain within the family group, may make the transfer give rise to informal and indirect benefits to the transferor so as to make it even more clear that it is just to tax him."

The judgment of the District Court will be

Reversed.