George FELDMAN, as Trustee in Bankruptcy of Leasing Consultants Incorporated, Bankrupt,

v.

The PHILADELPHIA NATIONAL BANK.

Civ. A. No. 73–1760.

United States District Court, E. D. Pennsylvania.

Jan. 12, 1976.

Lewis H. Gold, Philadelphia, Pa., for plaintiff.

E. Barclay Cale, Jr., Philadelphia, Pa., for defendant.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

In 1969 Leasing Consultants Incorporated (LCI or Bankrupt) purchased an aircraft with money it borrowed from The Philadelphia National Bank (PNB). As part of the transaction LCI leased the aircraft to W. A. Wheatland Associates, Inc. (Wheatland) and assigned the lease and payments thereunder to PNB as collateral for the loan. In October 1970, LCI was adjudicated bankrupt. On August 2, 1973 George Feldman, Trustee in Bankruptcy for LCI, instituted this suit against PNB to recover payments made by Wheatland to PNB after the date when LCI was adjudicated

bankrupt. The suit is based on the Trustee's contention that PNB's failure to record the lease and the assignment of lease with the Administrator of the Federal Aviation Agency renders the instruments invalid as to creditors of LCI, and that the Trustee has the power, under applicable provisions of the Bankruptcy Act, to recover for the benefit of the bankrupt estate all payments made subsequent to the adjudication.

PNB resists the Trustee's claim on several grounds: (1) the claim is barred by the statute of limitations; (2) the Federal Aviation Act does not require the recording of a lease of an aircraft; (3) PNB has a perfected security interest under the Uniform Commercial Code entitling it to the lease payments; and (4) the Trustee's claim is barred by his own actions and omissions.

The matter was tried to the Court on September 29, 1975. The parties submitted an extensive stipulation of facts and exhibits (Document No. 49). From the evidence submitted at trial and the stipulations of the parties, I make the following

## FINDINGS OF FACT

1. Leasing Consultants Incorporated, now bankrupt, is a New York corporation which engaged in the business of purchasing equipment which it leased to its customers. The customers gained certain tax advantages from such leasing arrangements.

2. On April 28, 1969, LCI requested The Philadelphia National Bank to finance the purchase of a 1969 Aerostar Aircraft, Model 601, Serial Number 61–0012–33, Registration Number N36DW, for $98,750, less a $20,750 trade-in allowance, so that LCI might lease the Aircraft to W. A. Wheatland Associates, Inc. On May 1, 1969, PNB agreed to finance the purchase at 9½% interest.

3. On May 1, 1969, LCI and Wheatland executed both a lease (Lease) and a document entitled "Aircraft Schedule," duly referenced to the Lease, covering one (1) 1969 Aerostar, Model 601 Turbo Charged Aircraft, Serial No. 61–0012, Registration No. N36DW. PNB thereafter took possession of the Lease and the Aircraft Schedule. (Stip. No. 1)

4. The Lease expressly provided that it was assignable without Wheatland's consent and that Wheatland had an absolute obligation to make its payments to any Assignee of LCI's "whether or not this Lease is terminated by operation of law or otherwise," with Wheatland's recourse for any claim being solely against LCI.

5. The Lease expressly limited Wheatland's interest to that of lessee only, all right, title, and interest being reserved in LCI, so that a true lease was created to afford Wheatland the favorable tax treatment associated therewith.

6. A separate writing executed by George Rodda, Vice President of LCI, granted Wheatland the option to purchase the aircraft for one dollar if all payments under the lease were made. The purchase option agreement was secret and did not become known to PNB until February 1971 when PNB received a copy of a letter from Richard Miller, President of Wheatland, to Daniel Zimmerman, counsel for George Feldman. LCI's Trustee in Bankruptcy.

7. By resolution of its Board of Directors, on May 13, 1969, Wheatland authorized the Lease Agreement with LCI in amounts up to $134,000. (Stip. No. 2)

8. LCI agreed to purchase the Aircraft from Eastern Prop Jet Sales, Inc. (Eastern) pursuant to a Purchase Agreement dated May 20, 1969 for a projected delivery date of June 20, 1969, for the sum of $98,750, less a trade-in allowance of $20,750. (Stip. No. 3)

9. By check dated June 26, 1969, LCI paid to Eastern the sum of $98,750 for the Aircraft. Eastern executed a Bill of Sale conveying title to the Aircraft to LCI, free of encumbrances, on June 27, 1969. (Stip. No. 4)

10. On June 27, 1969, Wheatland executed an acknowledgment of receipt of the Aircraft. (Stip. No. 5)

11. On June 30, 1969, LCI instructed PNB to apply a portion of the proceeds of the loan from PNB to discharge the balance of the debt owed on the aircraft used as a trade-in. LCI forwarded the Lease and the other Wheatland documents to PNB, and PNB took possession thereof.

12. On July 2, 1969, the Bill of Sale for the Aircraft was duly recorded with the Federal Aviation Administration (FAA) showing Eastern as seller, and LCI as purchaser/owner. (Stip. No. 6)

13. By letter of July 10, 1969, PNB forwarded to LCI a Demand Collateral Note and a Security Agreement for its execution, said documents to embody the finalized terms of the loan: Principal, totalling $93,138.22, plus $31,811.88 in interest to be paid in 70 equal monthly installments of $1,785 plus $112 on account of sales tax. (Stip. No. 7)

14. The Note provided, *inter alia*:

(1) that the LCI–Wheatland Lease was pledged as collateral;

(2) that PNB had the right at any time to notify any person obligated on the collateral to make payment due thereon directly to PNB;

(3) that PNB had the right to take control of any proceeds of the collateral;

(4) that "default" under the Note was constituted by, *inter alia*:

(a) nonpayment of amounts due;

(b) insolvency, assignments for the benefit of creditors, and the filing of any petition by or against the debtor, under any law or statute, alleging that the debtor was insolvent.

(5) that the Note became fully payable upon default without notice or demand by PNB;

(6) that PNB could exercise any of its Uniform Commercial Code remedies at any time after default; and

(7) that PNB had the right, at any time before or after default, to apply any proceeds of collateral received by PNB to pay down any liabilities owed by the debtor to PNB as PNB might elect.

15. The Security Agreement provided that LCI granted PNB a security interest, as governed by Pennsylvania's Uniform Commercial Code, in the Aircraft and all replacements thereof to secure the payment of the $93,138.22 loan evidenced by the Note's terms "as therein set forth," and any future advances, plus interest upon either.

16. The Security Agreement provided that the institution of any proceedings under the Bankruptcy Act constituted default thereunder, whereupon all sums became due and payable to PNB and PNB could exercise any rights it possessed by law or by agreement.

17. On July 16, 1969, LCI executed the Demand Collateral Note and LCI and PNB executed the Security Agreement. (Stip. No. 8)

18. On July 16, 1969, PNB credited LCI's account with the amount of $93,138.22, the proceeds of the loan, to finance the purchase of the Aircraft, and notified LCI by letter of the same date. On the same date, PNB debited LCI's account in the amount of $17,116.86 to pay off a prior loan. (Supp. Stip. No. 1)

19. On July 16, 1969, PNB mailed the Security Agreement to the FAA for recordation. (Stip. No. 10)

20. The Security Agreement was received by the FAA on July 18, 1969, and recorded by the FAA on August 19, 1969. (Stip. No. 11)

21. LCI executed and delivered to PNB on or about July 22, 1969 an undated document entitled "Assignment of lease dated May 1, 1969, between Leasing Consultants Incorporated, Lessor and W. A. Wheatland Associates, Inc., Lessee, covering one new Aircraft, registration # N36DW [the Aircraft]." (Stip. No. 12)

22. The "Assignment of Lease" was intended only as a device for payment of LCI's indebtedness to PNB.

23. On July 22, 1969, Wheatland executed and delivered to PNB a document entitled "Lessee's Acknowledgment." (Stip. No. 13)

24. PNB took possession of the Assignment and the Lessee's Acknowledgment on July 22, 1969.

25. LCI billed Wheatland for monthly payments due under the Lease and Wheatland sent these payments to PNB. (Stip. No. 14)

26. Neither the Demand Collateral Note nor the Lease nor the Assignment nor the Lessee's Acknowledgment nor the Purchase Option were mailed or otherwise delivered to the FAA for recordation, and none of these documents were recorded with the FAA by means other than as a result of the recordation of the Security Agreement. (Stip. No. 15)

27. Neither the Security Agreement nor the Demand Collateral Note nor the Lease nor Wheatland's Acknowledgment nor the Assignment of the Lease nor the Purchase Option for the Aircraft, nor any financing statement with respect thereto, were recorded or filed for record with any State recording office under or pursuant to the Uniform Commercial Code or otherwise. (Stip. No. 32)

28. LCI filed a Petition for an Arrangement under Chapter XI of the Bankruptcy Act in the United States District Court for the Eastern District of New York on August 18, 1970. (Stip. No. 17)

29. On September 11, 1970, PNB sent LCI a statement of the outstanding LCI leases held by PNB—among which was listed the Wheatland Lease with an outstanding balance due PNB of $78,757.56 —and directed LCI to continue billing its accounts and to have the lessees continue sending payments directly to PNB.

30. LCI was adjudged a bankrupt on October 16, 1970, and George Feldman was appointed, duly qualified, and is presently acting as Trustee in Bankruptcy of LCI. (Stip. No. 18)

31. On November 4, 1970, PNB notified Wheatland that it was exercising its rights under the Note by reason of LCI's default and made demand upon Wheatland to continue to send payments directly to PNB.

32. A first meeting of LCI's creditors was held on November 20, 1970, after which meeting the Trustee advised PNB that it should continue to accept all payments from LCI's lessees, and represented that he would make claim only to payments in excess of LCI's debt to PNB.

33. In February 1971 Wheatland inquired of PNB as to what information they had "concerning the pay-off of the aircraft." Ronald Turner, Commercial Officer for PNB, responded that he would contact Daniel Zimmerman, counsel for the Trustee of LCI.

34. In a letter dated February 18, 1971, Daniel Zimmerman represented to PNB, *inter alia*, that (1) "the entire rental obligation of Wheatland is payable to your bank on the underlying note;" (2) "Leasing has no equity therein;" (3) "Leasing's only equity is in the Aircraft itself;" (4) "The lease, which expires May, 1975, contains no purchase option whatsoever;" (5) "[W]e have no objections to Wheatland paying up the lease to you at whatever payout figure you may give them. At best this is of no real consequence to us."

35. A copy of Zimmerman's letter of February 18 was delivered to Richard Miller, President of Wheatland. On February 24, 1971, Miller wrote to Zimmerman "enclosing a copy of a purchase option for $1.00 signed by Mr. George Rodda, Vice President of Leasing Consultants." Miller further stated that "it was on this basis that we took the lease from Leasing Consultants." A copy of Miller's letter was forwarded to Ronald Turner, Commercial Officer for PNB.

36. In a letter dated May 11, 1971, counsel for the Trustee disputed the validity of the purchase option claimed by Wheatland.

37. On July 14, 1971, Wheatland made an offer (the offer to expire July 30, 1971) to pay the Trustee $1,000 for the Aircraft's "mortgaged title," which the Trustee held.

38. On July 20, 1971, the Trustee in Bankruptcy filed with the United States District Court for the Eastern District of New York an "Application for Authority to Compromise Controversy." (Stip. No. 21)

39. In the petition, the Trustee, by his counsel represented, *inter alia*, that (1) "The bankrupt . . . assigned all the remaining lease rentals to the Philadelphia National Bank ('PNB'). PNB duly perfected its mortgage by filing with the F.A.A. in Oklahoma City,". and (2) "[T]itle to the aircraft is in the bankrupt."

40. On July 22, 1971, the Court in which the bankruptcy proceedings of the Bankrupt were pending entered an Order authorizing the Trustee in Bankruptcy to transfer to Wheatland his right, title and interest in the Aircraft and the accompanying Lease. (Stip. No. 22)

41. The Trustee in Bankruptcy executed a Bill of Sale of the Aircraft to Wheatland and forwarded it to Wheatland under cover of letter dated August 13, 1971. PNB received a copy of this Bill of Sale in August 1971. (Stip. No. 24)

42. On January 16, 1972, the Bill of Sale was filed with the FAA. (Stip. No. 26)

43. In response to a further inquiry PNB, by letter of August 24, 1971, advised Wheatland that $64,955.42 was the balance due PNB. (Stip. No. 25)

44. PNB received payments of $1,785 each on July 28, 1969, September 2, 1969, September 23, 1969, October 28, .1969, December 1, 1969, December 29, 1969, January 29, 1970, March 16, 1970, March 24, 1970, April 24, 1970, July 13, 1970, July 26, 1970, August 6, 1970, September 1, 1970, October 16, 1970, November 10, 1970, December 9, 1970, January 14, 1971, February 9, 1971, March 15, 1971, April 22, 1971, June 1, 1971 (2 payments), August 9, 1971 (2 payments), September 30, 1971 (2 payments), December 20, 1971 (2 payments), February 2, 1972 (3 payments), July 11, 1972 (2 payments), August 28, 1972 (2 payments), October 4, 1972 (2 payments), November 13, 1972 (2 payments), December 18, 1972, January 26, 1973 (2 payments), and April 11, 1973. In addition, payments of $112 were received from July 28, 1969 to and including April '12, 1971 in accordance with the foregoing schedule and a payment of $224 was received on June 1, 1971. All of these payments were upon checks of Wheatland or Donald Wolk. PNB did not receive any payments from LCI. (Stip. No. 19)

45. All payments were received by PNB without objection from the Trustee.

46. On April 19, 1973, Donald Wolk contacted PNB seeking information as to how much was owed to PNB on the Aircraft.

47. On April 26, 1973, Daniel Zimmerman, counsel for Trustee, wrote a letter to PNB advising that it was the Trustee's position that he was entitled to all post bankruptcy rental payments on the aircraft made to PNB.

48. On May 23, 1973, Wheatland mailed a letter to PNB, wherein it stated that it enclosed "a certified check in the amount of $42,433.94 in full payment of the Aerostar 601 Serial # 61–0012–33 [the Aircraft]." (Stip. No. 27)

49. On May 24, 1973, PNB received from Wheatland the check of Henry Weber Distributors, Inc., endorsed by Wheatland, in ·the amount of $42,433.94 which it applied to satisfy in full the Loan to LCI, and which it acknowledged by letter dated May 24, 1973. (Stip. No. 28)

50. On May 24, 1973, PNB notified the Trustee that it had accepted the Weber check in payment of the remaining balance on the Lease it had been collecting for LCI.

51. In agreeing to allow Wheatland to discharge the security interest in the aircraft, PNB relied upon the Trustee's Bill of Sale.

52. On June 1, 1973, PNB executed a release of lien form and forwarded it to Richard Miller. Donald Wolk forwarded the release of lien form to Henry Weber on June 8, 1973.

53. From October 16, 1970, until April 26, 1973, the Trustee did not object to PNB's continued receipt of the rental payments, and the Trustee did not file suit to recover the payments until August 2, 1973.

54. The following creditors have filed proofs of claim in the bankruptcy proceedings of LCI, in the amounts set forth opposite their names, and each of these claims is provable under the Bankruptcy Act:

| | |
|---|---|
| (a) Dun & Bradstreet, Inc. | $ 1,886.80 |
| (b) Western Union Telegraph Co. | 700.69 |
| (c) 301 Associates | 863,947.91 |
| (d) Koehring Company | 72,505.80 |
| (e) Kelly Tractor Company | . 4,400.00 |
| (f) Internal Revenue Service | 47,928.51 |

(Stip. No. 29)

## DISCUSSION

### 1. *Statute of Limitations*

Section 11(e) of the Bankruptcy Act, 11 U.S.C. § 29(e) (1966), provides:

"A receiver or trustee may, within two years subsequent to the date of adjudication or within such further period of time as the Federal or State law may permit, institute proceedings in behalf of the estate upon any claim against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy. . . ."

The Supreme Court has interpreted the section to mean that if the cause of action arises under the Bankruptcy Act itself, the two year period is the maximum time allowed in which to bring suit. If the cause of action is "inherited . . from the bankrupt or the bankrupt's creditors," that is, arises under state law or non-bankruptcy federal law, and the applicable state or federal limitations period extends beyond the two year period of § 11(e), then the longer is taken to be the applicable limitations period. *Herget v. Central National Bank & Trust Co.*, 324 U.S. 4, 65 S.Ct. 505, 89 L.Ed. 656 (1945). *See* 1A Collier on Bankruptcy ¶ 11.13 (14th ed. 1975). In the instant case the period between LCI's adjudication as bankrupt (October 16, 1970) and the filing of the complaint (August 2, 1973) exceeds two years, and therefore, the Trustee's claim will be barred unless his cause of action arises outside of the Bankruptcy Act.

It is not always clear whether a cause of action arises under the Bankruptcy Act or under state or non-bankruptcy federal law. The Trustee here instituted this suit under §§ 70(c) and 70(e) of the Bankruptcy Act, 11 U.S.C. § 110(c) (Supp.1975), and (e) (1953), respectively.

Section 70(c) provides in part:

" . . . The trustee shall have as of the date of bankruptcy the rights and powers of: (1) a creditor who obtained a judgment against the bankrupt upon the date of bankruptcy, *whether or not such a creditor exists*, (2) a creditor who upon the date of bankruptcy obtained an execution returned unsatisfied against the bankrupt, *whether or not such a creditor exists*, and (3) a creditor who upon the date of bankruptcy obtained a lien by legal or equitable proceedings upon all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt upon a simple contract could have obtained such a lien, *whether or not such a creditor exists.* . . ." (Emphasis added)

Section 70(e) provides in part:

"(1) A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason *by any creditor* of the debtor, *having a claim provable* under this title, shall be null and void as against the trustee of such debtor." (Emphasis added)

■ Under § 70(c) the Trustee is given the rights, as of the date of the filing of the petition, of a judicial lien creditor, whether or not one exists (the so-called ideal lien creditor). The rights are conferred by, and arise under, the Bankruptcy Act, and are therefore subject to the two year limitations period. *Feldman v. First National City Bank*, 511 F.2d 460 (2d Cir. 1975). To the extent that the Trustee seeks to recover under § 70(c), therefore, his claim is time barred.

■ To the extent, however, that the Trustee is asserting a claim under § 70(e), I conclude that this suit is not barred by the statute of limitations. In suits under § 70(e) the Trustee steps into the shoes of an *actual, existing* creditor to prosecute the claim. In such cases, had there not been a bankruptcy, the creditor could have brought suit under state or other federal law. The cause of action exists independent of the Bankruptcy Act and, therefore, the longer state or federal limitations period is applicable. *Herget, supra. Feldman v. First National City Bank, supra,* implicitly approved of the application of longer statutes of limitations to suits under § 70(e). *See* 511 F.2d at 463. This view appears to be generally followed. *See Harrington v. Yellin,* 158 F.Supp. 456 (E.D.Pa.1958); *Schutte v. Wittner,* 149 F.Supp. 451 (E.D.N.Y.1957); *Halpert v. Engine Air Service, Inc.,* 116 F.Supp. 13 (E.D.N.Y.1953); 4A Collier on Bankruptcy ¶ 70.93[3] (14th ed. 1975). I conclude, therefore, that suits brought by the Trustee under § 70(e) of the Bankruptcy Act may be brought within the period of time allowed by the applicable state or federal statute of limitations since there are existing creditors with claims provable in bankruptcy.

■ The § 70(e) claim here is predicated on the invalidity of the transfer under the recording provisions of the Federal Aviation Act. That Act specifies no statute of limitations period, thus the applicable state statute of limitations governs. The specific common law cause of action on which the Trustee bases this suit is unclear, but it seems to be in the nature of a suit for money had and received, as to which Pennsylvania's six year statute of limitations is applicable. 12 P.S. § 31 (Purdon 1953). This suit was filed well within the six years limitations · period and therefore may be maintained under § 70(e).

2. *Failure to Record Lease and Assignment of Lease*

 (a) *Recording Requirements of Federal Aviation Act*

Section 503 of the Federal Aviation Act, 49 U.S.C. § 1403 (hereinafter the Act), provides in part:

"1403. Recordation of Aircraft ownership—Establishment of recording system

(a) The Administrator shall establish and maintain a system for the recording of each and all of the following:

(1) Any conveyance which affects the title to, or any interest in, any civil aircraft of the United States;

(2) Any lease, and any mortgage, equipment trust, contract of conditional sale, or other instrument executed for security purposes, which lease or other instrument affects the title to, or any interest in, any specifically identified aircraft engine or engines of seven hundred and fifty or more rated takeoff horsepower for each such engine or the equivalent of such horsepower, or any specifically identified aircraft propeller capable of absorbing seven hundred and fifty or more rated takeoff shaft horsepower, and also any assignment or amendment thereof or supplement thereto;

(3) Any lease, and any mortgage, equipment trust, contract of conditional sale, or other instrument executed for security purposes, which lease or other instrument affects the title to, or any interest in, any aircraft engines, propellers, or appliances maintained by or on behalf of an air carrier certificated under section 1424(b) of this title for installation or use in aircraft, aircraft engines, or propellers, or any spare parts maintained by or on behalf of such an air carrier, which instrument need only describe generally by types the engines, propellers, appliances, and spare parts covered thereby and designate the location or locations thereof; and also any assignment or amendment thereof or supplement thereto.

Recording of releases, cancellations, discharges or satisfactions

(b) The Administrator shall also record under the system provided for in subsection (a) of this section any release, cancellation, discharge, or satisfaction relating to any conveyance or other instrument recorded under said system.

Validity of conveyances or other instruments; filing

(c) No conveyance or instrument the recording of which is provided for by subsection (a) of this section shall be valid in respect of such aircraft, aircraft engine or engines, propellers, appliances, or spare parts against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof, until such conveyance or other instrument is filed for recordation in the office of the Administrator . . . .

Effect of recording

(d) Each conveyance or other instrument recorded by means of or under the system provided for in subsection (a) or (b) of this section shall from the time of its filing for recordation be valid as to all persons without further or other recordation . . . .

* * * ''

It is the Trustee's position that the Lease and the Assignment of Lease are "conveyances" within the meaning of the Act, which must be recorded to be valid against LCI's creditors, and since they were not recorded, PNB is not entitled to retain the lease payments as against creditors without actual notice. PNB, on the other hand, asserts that the lease of an aircraft is not required to be recorded under the Act, that it has a perfected security interest in the aircraft by the recording of its Security Agreement with the Federal Aviation Administration and that the provisions of the Uniform Commercial Code are applicable, giving it the right to retain the rental payments.

(b) *The Lease as a Conveyance*

■ In *Feldman v. Chase Manhattan Bank, N. A.,* 368 F.Supp. 1327 (S.D.N.Y.

1974), *rev'd on other grounds,* 511 F.2d 468 (2d Cir. 1975), a suit involving LCI's Trustee and facts similar to the instant case, the District Court for the Southern District of New York held that an assignment of lease of an aircraft is an instrument that the Federal Aviation Act requires to be recorded to be valid against third parties. The court reasoned that the statutory language of the Federal Aviation Act recording provisions requiring that a "conveyance which affects . . . any interest in" an aircraft be recorded was broad enough to encompass an assignment of a lease, and concluded that "[c]learly the present possessory right and the entitlement to rentals conferred by a lease agreement are property 'interests' as the term has been generally understood," citing Coke upon Littleton and I American Law of Property § 3.2, 368 F.Supp. at 1332. So viewed, I would agree that the phrase "any interest" is broad enough to include a lease or assignment of lease. A close analysis of the statutory provisions, however, leads me to conclude that Congress did not intend to include leases and assignments of leases of aircraft within the recording provision of the Act.

■ The above quoted § 1403(a)(1) requires the recording of "any conveyance which affects . . . " title or any interest in aircraft. "Conveyance" is defined as:

". . . a bill of sale, contract of conditional sale, mortgage, assignment of mortgage, or other instrument affecting title to, or interest in, property." 49 U.S.C. § 1301(17)

"Conditional sale" includes a contract for leasing only where:

". . . the bailee or lessee contracts to pay as compensation a sum substantially equivalent to the value thereof, *and* by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner thereof . . . ." 49 U.S.C. § 1301(16) (Emphasis added)

Nowhere do the recording provisions explicitly provide that leases of aircraft must be recorded. The most reasonable

interpretation is that the omission must have been intentional, and that leases of aircraft were not meant to be subsumed within the phrase "instrument affecting title to, or interest in, property" used in defining "conveyance." The reasons for this are two-fold: First, subparts (2) and (3) of the same section expressly provide that leases of certain aircraft *engines, propellers, appliances,* or *spare parts* must be recorded. 49 U.S.C. § 1403(a)(2), (a)(3). In comprehensive enactments all omissions should be taken as exclusions, and this is especially so where other sections include the thing omitted. *See* 2A Sutherland Statutory Construction § 47.23 (4th ed. C.D.Stands 1973). Second, examination of the subsection defining "conveyance" reveals that each transaction listed thereunder is one which immediately divests or has the potential for divesting the titleholder of his title to or interest in the property. The lease is not such a transaction. *See* R. Brown, *Brown on Personal Property* § 5 (2d ed. 1955). Under this analysis, I conclude that a lease is not a conveyance within the meaning of § 1403(a)(1), and if a lease is not, it follows that an assignment of lease is likewise not within the Act.

■ The Trustee's argument that leases and assignments of leases must be recorded is based in part on the regulations promulgated by the Administrator. Section 49.31 of Title 14 of the Code of Federal Regulations deals with the applicability of the recording provisions to aircraft ownership and encumbrances against aircraft. It provides:

"This subpart applies to the recording of the following kinds of conveyances:

(a) A bill of sale, contract of conditional sale, assignment of an interest under a contract of conditional sale, mortgage, assignment of mortgage, lease, equipment trust, notice of tax lien or other lien, or other instrument affecting title to, or any interest in, aircraft. * * * "

The Trustee points out that leases are specifically included and argues that assignments come within "other instru-

ment." The answer is that, while regulations have the force and effect of statutes (*Farmer v. Philadelphia Electric Co.*, 329 F.2d 3 (3d Cir. 1964)), they cannot require more than the statute under which they were promulgated. (*Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *McCeney v. District of Columbia*, 97 U.S.App.D.C. 282, 230 F.2d 832 (1956)). The regulations do no more than establish filing requirements for fees, forms, formal requisites, etc. Section 49.31 sets forth the types of documents which are eligible for recording. A lease, while not the subject of *required* recording under the Act, *may* be filed. More telling is the omission from § 49.31 of "assignment of lease," which, had the FAA intended to include it, would have enjoyed a position immediately following "lease," just as "assignment of mortgage" follows "mortgage."

The Security Agreement gave PNB a mortgage on the aircraft. That was a conveyance which affected title to the aircraft, and its recording with the FAA was a compliance with the scheme of the Act. In my view, true leases and assignments of leases are not within the purview of the Act's recording provisions, and, therefore, the Trustee may not attack PNB's entitlement to the lease payments on the ground of the failure to record the Lease and Assignment of Lease with the Administrator of the FAA.

(c) *The "Assignment" as a Conveyance*

The instrument entitled "Assignment of lease dated May 1, 1969" contains language by which LCI purported to "sell, assign and transfer" to PNB the "contract" and all of LCI's "right, title and interest . . . in and to the property therein described . . . ." If the "assignment" was indeed a conveyance of LCI's ownership interest in the aircraft, then it was an instrument which was required to be recorded with the FAA to be valid against third parties without actual notice of the conveyance. 49 U.S.C. § 1403(c); 49 U.S.C. § 1301

(17); 14 C.F.R. § 49.31 (1975). *See* Discussion *supra.*

PNB responds to this contention with two arguments. First, if it is a conveyance, the recordation of the Aircraft Security Agreement placed third parties on inquiry notice of PNB's interest, and hence was valid constructive notice of the conveyance to LCI's creditors, and second, that the Assignment was only an assignment, not a conveyance, and therefore was not required to be recorded at all. I reject PNB's first argument and accept the second.

As to the constructive notice argument, if the recording had been under the provisions of Article Nine of the Uniform Commercial Code, PNB's contention would have merit. Article Nine adopts a system of "notice filing" whereby the only document filed is a financing statement which is no more than a "simple notice" indicating "merely that the secured party who has filed may have a security interest in the collateral described." UCC § 9–402, Comment 2, 12A P.S. § 9–402. The recorded financing statement is intended only to give interested parties notice that someone may already have a perfected security interest in the described collateral. "Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs." *Id.* The notice filing system does not require that the *instrument* through which the secured party seeks to obtain a perfected security interest be recorded. The intent is simply to provide interested parties with sufficient notice and information that through further reasonable efforts they will be able to discover the exact degree to which other parties already possess a secured interest in the relevant collateral. Under the notice filing system the recordation of the Aircraft Security Agreement would be sufficient notice that PNB might hold a further interest in the collateral, including a potential title interest.

■ Under the Federal Aviation Act recording provisions, however, PNB's contention that the creditors had constructive notice of the conveyance (if the Assignment be so construed) cannot be sustained. The Federal Aviation Act does not adopt a notice filing system with respect to conveyances, but instead requires that the instrument of conveyance through which the party claims the interest must itself be filed with the Administrator for recording. The Act explicitly states that an instrument is invalid as to third parties without actual notice unless that *instrument* is on file with the Administrator. To hold that the Aircraft Security Agreement placed creditors on inquiry notice of the Assignment (as a conveyance) would substantially modify the operation of the statute and defeat the legislative intent of enabling third parties to rely upon the state of the record at the Administrator's office to determine all matters relating to transfer of title to the aircraft. *Cf. Marsden v. Southern Flight Service, Inc.,* 227 F.Supp. 411, 417 (M.D.N.C.1964); 14 C.F.R. § 49.33 (1975). If, therefore, the Assignment was a conveyance, it was invalid as such as to LCI's creditors without actual notice.

■ Although the Assignment contained words of conveyance of LCI's ownership interest in the Aircraft, it is nevertheless clear that LCI, PNB, and the Trustee at all times treated the Assignment as only an assignment of the lease. The Trustee made no objection to Wheatland's acknowledgment of the assignment, which acknowledged an assignment of lease only. The Trustee did not object to the notice sent by PNB on September 11, 1970, after LCI had filed its petition for bankruptcy, indicating that PNB held only the Lease to the Aircraft, and not title. On November 2, 1970 the Trustee directed PNB to continue accepting all payments from LCI's lessees. In a letter dated February 18, 1971, counsel for the Trustee represented that LCI still held equity in the Aircraft, and that LCI was foregoing claim only to the lease payments. In his petition to the Bankruptcy Referee to sell all his right, title and interest in the Aircraft for $1,000, the Trustee represented that "title to the aircraft is in the bankrupt."

It is clear that all the parties viewed the Assignment as nothing more than an assignment of the Lease for purposes of collection only. Under these circumstances it would be inequitable to now permit the Trustee to claim that the Assignment was more than an assignment, that it was a conveyance. I conclude, therefore, that the instrument entitled "ASSIGNMENT of lease dated May 1, 1969" was only an assignment of the Lease, and was not a conveyance of the aircraft within the meaning of 49 U.S.C. § 1403(a)(1).

(d) *The Lease as a Conditional Sale*

■ The Trustee argues that even if the Act does not require that leases be recorded, the LCI-Wheatland Lease was, in fact, a conditional sale because the Lease was accompanied by a purchase option (49 U.S.C. § 1301(16)); that a conditional sale is clearly within the Act's definition of "conveyance" (49 U.S.C. § 1301(17)); and, therefore, it was required to be recorded with the Administrator to be valid against third parties without actual notice. The Trustee's argument falls of its own weight. The existence of the purchase option was kept secret, and the first indication to PNB that such an option might exist was in February 1971. As late as May 11, 1971, counsel for the Trustee stated that he doubted the validity of the purchase option. Since the purchase option was not recorded, as required, it was invalid as to PNB which was without actual notice.

3. *PNB's Perfected Security Interest*

PNB claims a perfected security interest in the Lease payments it has received and seeks to retain. It bases its claim on the Aircraft Security Agreement executed by LCI to secure PNB's loan, and on the Lease and Assignment of Lease, both of which have at all times been in PNB's custody and possession.

(a) *Validity of the Security Agreement*

■ The Trustee argues that the Aircraft Security Agreement was invalid *ab initio*. According to the Trustee, the grant of the purchase option made the transaction a conditional sale, under which LCI had released all its title to the Aircraft, retaining only a security interest. Without a title interest, LCI did not have the power to grant PNB a valid security interest in the Aircraft. The Trustee contends, therefore, that the only collateral that PNB in fact had for the loan was the unrecorded Assignment of Lease. This contention ignores the fact that, insofar as PNB was concerned, the purchase option was invalid, the LCI-Wheatland transaction was a pure lease transaction *(see supra),* and LCI's grant to PNB of a security interest in the Aircraft was valid and effective. That valid security interest was not rendered invalid simply because, at a later date, PNB learned that a purchase option might have been granted to Wheatland.

(b) *Preemption of the Uniform Commercial Code by the Federal Aviation Act*

The Trustee argues that the Uniform Commercial Code is inapplicable to the transactions between the parties in this case because any transaction conveying any title or interest in an aircraft is regulated exclusively by the Federal Aviation Act, that is, that the entire field is preempted by the Act.

■ The Federal Aviation Act creates a framework for a nationwide system to record certain interests in aircraft and major aircraft components. The Administrator of the FAA is empowered to promulgate regulations to implement the mechanics of the system. *See* 14 C.F.R. § 49.11, et seq. (1974). These provisions represent the entry of federal law into an area of interstate commerce. To the extent that state law conflicts with any part of the Federal Aviation Act, it is preempted by the Act under Congress' power to regulate interstate commerce. U.S.Const. art. I, § 8; *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1, 6 L.Ed. 23 (1824); *Marsden v.*

*Southern Flight Service, Inc.,* 227 F.Supp. 411, 415 (M.D.N.C.1964); *United States v. United Aircraft Corp.,* 80 F.Supp. 52, 54 (D.Conn.1948).

 The Trustee errs, though, when he asserts that the effect of the Federal Aviation Act recording provisions is to remove transactions involving aircraft entirely from the effect of state law. While Congress may choose to regulate an aspect of interstate commerce, unless the clear intent of the legislation is to occupy the field entirely, the states have the power to continue to regulate in that area consistent with the federal law. *Pennsylvania v. Nelson,* 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 229–30, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). In this instance it seems clear that it was the intent of Congress to substitute for a multiplicity of state registration and recording systems a single nationwide system for registering instruments of title and recording certain security documents on property which is highly mobile and which moves quickly and frequently between states. Congress did not intend, however, to displace and preempt all state law involving priorities of liens and title interests in aircraft. *See State Securities Co. v. Aviation Enterprises, Inc.,* 355 F.2d 225 (10th Cir. 1966); *Feldman v. Chase Manhattan Bank, N. A.,* 368 F.Supp. 1327, 1331 (S.D. N.Y.1974), *rev'd on other grounds,* 511 F.2d 468 (2d Cir. 1975); *Southern Jersey Airways, Inc. v. National Bank of Secaucus,* 108 N.J.Super. 369, 261 A.2d 399 (1970). Section 1406 of the Act specifically provides that state law shall determine the validity of all instruments required to be recorded under the Act, and since the Act makes no attempt to spell out remedies available to holders of such instruments, it is apparent that state law was intended to govern. The Uniform Commercial Code specifically recognizes the supremacy of the federal recording provisions, but it also reflects that the intent of the federal law is to preempt only the filing provisions of the UCC. *See* 12A P.S. § 9–302, Comment 8; 12A P.S. § 9–104, Comment 1. Where the state's law, as reflected by the Uniform Commercial Code, does not conflict with the federal law, it is applicable to transactions involving aircraft. *See Feldman v. Chase Manhattan Bank, N. A.,* 511 F.2d 468, 470 (2d Cir. 1975). Those provisions of the UCC on which PNB relies to establish its right to the lease payments under the Aircraft Security Agreement do not, in my view, conflict with the Act. They are, therefore, not preempted, and are applicable.

(c) *PNB's Rights Under the UCC*

The Trustee agrees that the Aircraft Security Agreement between PNB and LCI was effectively recorded with the FAA on August 19, 1969. So recorded, PNB had a perfected security interest in the Aircraft. 12A P.S. § 9–303(1). Although the terms of the Security Agreement did not specifically grant PNB a security interest in the lease payments due from Wheatland, they did grant PNB a security interest "pursuant to the Uniform Commercial Code (Pa.) . . . ." It should be noted that even if the quoted language had not been included, the Uniform Commercial Code as adopted in Pennsylvania would have been applicable except for those provisions (such as recording) as to which the UCC was preempted by the Federal Aviation Act. 12A P.S. §§ 9–102, 9–302(3)(a) and 9–104, Comment 1.

 Under the Uniform Commercial Code, if the interest in the original collateral is perfected, "[t]he security interest in proceeds [thereof] is a continuously perfected security interest . . . ." 12A P.S. § 9–306(3). " 'Proceeds' includes whatever is received when collateral is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right." 12A P.S. § 9–306(1). A secured party is entitled to rent which represents the proceeds of chattel paper, i. e., a lease. *Associates Discount Corp. v. Old Freeport Bank,* 421 Pa. 609, 220 A.2d 621 (1966). Money,

checks and the like are also proceeds in which the secured party has a perfected security interest when arising under a contract right to payment. 12A P.S. § 9–306(1). PNB's security interest in the Aircraft's proceeds was good for only ten days unless otherwise perfected, 12A P.S. § 9–306(3)(b). Here PNB took possession of the lease and it also took possession of each of the lease payments within ten days of the time they were made, thus giving it a continuous perfected security interest in the proceeds. 12A P.S. § 9–305. In sum, PNB had a continuous perfected security interest in the lease payments through the recording of the Aircraft Security Agreement and possession of the Lease.

■ The Security Agreement also expressly provided that the filing of a petition under the Bankruptcy Act was an event constituting default, and that upon default PNB was entitled to exercise the rights and remedies provided by the Uniform Commercial Code (Pa.). Under the UCC, PNB had the right upon default to take control of all proceeds of the collateral in which it had a perfected security interest. 12A P.S. §§ 9–501, 9–502(1), 9–306, 9–503(1). Through the Aircraft Security Agreement, then, LCI's bankruptcy gave PNB the right to receive and retain all lease payments made to it by Wheatland.

The instant case is identical in all material respects to *Feldman v. National Bank of North America*, 511 F.2d 465 (2d Cir. 1975), even to the extent of involving the same Bankrupt and the same Trustee. The Trustee seeks to distinguish that case from the present one by the fact that the bank's chattel mortgage in the Second Circuit case specifically provided that upon default the bank could "collect and receive rents, issues, profits, revenues and other income . . . ." from the aircraft. This, says the Trustee, was the basis for the Court of Appeals' affirmance of the bank's right to retain the lease payments. Since the UCC provides a like remedy, the presence of the specific provision is a distinction without a difference.

(d) *PNB's Rights Under the Assignment of Lease*

■ The Assignment of Lease was executed on July 22, 1969, less than a month after the Lease was executed. On the same day Wheatland executed a "Lessee's Acknowledgment" recognizing that all lease payments had been assigned to PNB. PNB also claims a right to the payments under the Assignment of Lease, arguing that the Assignment was for purposes of collection only, not for security purposes, and was thus exempt from Article Nine's provisions governing the perfection of security interests by recording or otherwise. Since PNB already had the perfected security interest through the Aircraft Security Agreement and possession of the Lease, it appears, and I so find, that the Assignment was for collection purposes only—to facilitate direct payment of the loan by means of the rent payments. As such, the Assignment was exempt from the provisions of Article Nine, 12A P.S. § 9–104(f); *Lyon v. Ty-Wood Corp.*, 212 Pa.Super. 69, 239 A.2d 819 (1968). But even if the Assignment had been as additional security, PNB's security interest was perfected without filing, by its possession of the Assignment. 12A P.S. § 9–305.

4. *Claim Barred by Trustee's Actions and Omissions*

(a) *Estoppel by the Trustee's Inaction*

■ As an additional ground, PNB's right to retain the rental payments can be based on the Trustee's conduct which estops him from asserting any claim he might otherwise have had to the payments.

LCI was adjudicated bankrupt and George Feldman was appointed Trustee on October 16, 1970. Under the terms of the Security Agreement between LCI and PNB, the filing of the petition in bankruptcy constituted a default by LCI. The Agreement provided that upon default PNB had all of the rights of a creditor under Pennsylvania's Uniform Commercial Code. Some of these rights

have been discussed previously, *e. g.*, the right to proceeds from the collateral. The UCC also grants the creditor, in the case of default, the right to take possession of the collateral, 12A P.S. § 9–503, and to "sell, lease or otherwise dispose of any or all of the collateral . . . ." 12A P.S. § 9–504. PNB could have taken possession of the Aircraft from Wheatland, Wheatland having no greater interest in the Aircraft against PNB than LCI had, and could have sold the airplane or re-leased it to another party. PNB might even have sold the Aircraft at a public sale, purchased the Aircraft itself, and then leased it to Wheatland directly. 12A P.S. § 9–504(3). PNB chose none of these alternatives, but rather continued collecting the lease payments from Wheatland. At the first meeting of creditors following the adjudication in bankruptcy, the Trustee acknowledged PNB's right to continue receiving such payments and disavowed any claim except to such amounts as might exceed LCI's indebtedness to PNB. Later the Trustee, through his counsel, conceded PNB's right to the lease payments and LCI's lack of interest therein. The Trustee made no objection to PNB's continued receipt of the lease payments for some 30 months following the adjudication of bankruptcy. During this time, on August 12, 1971, the Trustee executed a Bill of Sale conveying all his interest in the Aircraft to Wheatland. The last regular rental payment was made by Wheatland on April 11, 1973. The Trustee first objected to PNB's retention of the lease payments on April 26, 1973.

All of the lease payments were accepted by PNB in lieu of exercising other remedies to recover the loan proceeds, PNB expecting, by reason of the Trustee's disavowals, that there would be no question raised as to its right to continue receiving the payments in repayment of the loan. PNB relied on the Trustee's non-objection in choosing not to assert any of its other remedies. In such a situation the Trustee is estopped from asserting any right he might have to the lease payments.

In *Feldman v. Chase Manhattan Bank, N. A.*, 511 F.2d 468, 470 (2d Cir. 1975), the Court of Appeals for the Second Circuit found an estoppel based on similar inaction by the Trustee of LCI. The Trustee now seeks to distinguish that case on the ground that there he failed to make any clear objection to the bank's receipt of the lease payments until after the bank released its lien on the Aircraft, while here the Trustee made known his objection to PNB prior to the date on which it released the lien, June 1, 1973. At most, this distinction gives the Trustee an opportunity to attack payments made after the Trustee belatedly notified PNB that he was making claim to the payments. Only one payment was made by Wheatland to PNB after the April 26, 1973 letter of the Trustee claiming a right to the lease payments. On May 23, 1973, Wheatland sent to PNB a check in the amount of $42,433.94 to pay off the remaining balance on the Lease and the LCI loan (including one month's interest). In exchange, PNB released its lien on the Aircraft to Wheatland, enabling the latter to sell the Aircraft to Weber Distributors. This final payment realistically was the payoff of the remaining principal on the outstanding LCI loan rather than a lease payment. The act which estops the Trustee from successfully asserting claim to this final payment is the Trustee's execution of the Bill of Sale by which he conveyed all "right, title and interest" in the Aircraft to Wheatland in consideration of the payment of $1,000. In so doing, putting aside the legal effect of the Bill of Sale, the Trustee publicly acknowledged that he no longer had any interest in the Aircraft. PNB reasonably relied on the delivery of the Bill of Sale as an expression by the Trustee that he no longer considered himself to have any interest in the Aircraft or its proceeds. The evidence at trial satisfied me that PNB did in fact rely on the Trustee's execution of the Bill of Sale in its decision to release PNB's lien on the Aircraft. ·The release of the lien was to PNB's detriment, and, therefore, the execution of the Bill of Sale by the Trustee

estops him from asserting any claim to the final payment for which PNB released its lien.

### (b) *Legal Effect of Bill of Sale*

In response to an offer by Wheatland to pay the Trustee "$1,000.00 for the mortgaged title that you hold," the Trustee sought and obtained authorization from the Referee in Bankruptcy to accept Wheatland's offer "in exchange for the Trustee's right, title and interest as it may appear" in the Aircraft. On August 12, 1971, the Trustee conveyed by Bill of Sale, "all of his right title and interest in and to" the Aircraft. The Bill of Sale was recorded with the Administrator of the FAA. PNB argues that, in so doing, the Trustee conveyed away all his interest in the Aircraft and thus lost any claim he might have had to the lease payments or to the final payment of principal by Wheatland to PNB. The Trustee argues that the Bill of Sale conveyed all of his right, title and interest in the Aircraft, but it did not convey his interest in the Lease and in the lease payments.

█ The right to lease property is unquestionably one of the incidents of ownership, and although a lease is not a conveyance within the meaning of § 1403(a)(1) of the Act, it nevertheless is one of the rights conveyed with title. The Trustee's Bill of Sale, therefore, did convey whatever interest he had in the Lease and in all rights accruing thereunder, including his right to lease payments. *See* 1 American Law of Property § 359 (A.Casner ed. 1952); *United States v. Shafto*, 246 F.2d 338, 341 (4th Cir. 1957).

The consequence of the Trustee's sale of his interest in the Aircraft is twofold. First, LCI's and Wheatland's interests in the Aircraft merged in Wheatland, making Wheatland both lessor and lessee of the Aircraft. The effect of merging those interests was to extinguish the Lease. The Wheatland-PNB relationship thereafter must realistically be viewed as one of mortgagor-mortgagee, and all payments made by Wheatland thereafter

were payments of principal and interest in discharge of the loan owing to PNB. The Lease served only to specify the means and time of repayment. *Cf.* 1 H. Tiffany, Landlord and Tenant § 146(b).

The second consequence of the Bill of Sale was to release whatever rights the Trustee had under § 70(e) of the Bankruptcy Act to set aside any transfer relating to the Aircraft or any interest therein by LCI.

The Trustee contends that his rights under § 70(e) were fixed as of the date of bankruptcy and are not affected by anything which transpired thereafter. This position is entirely too broad and is untenable. "[A]lthough the trustee under § 70(e) asserts the rights of creditors, he does so in his capacity as trustee, and hence is endowed with whatever additional status the Act confers upon him in that capacity." 4A Collier on Bankruptcy ¶ 70.90[1]. One such status is that by which title to all the property in the bankrupt estate is vested in the trustee. Bankruptcy Act § 70(a), 11 U.S.C. § 110(a). Section 70(f) of the Bankruptcy Act directs the trustee to sell, with court approval, property of the estate. 11 U.S.C. § 110(f). While the question as to the trustee's power to convey, as a separate asset, a § 70(e) power of avoidance is not yet settled (*see* 4A Collier on Bankruptcy ¶ 70.92[4]), it is clear that a confirmed sale in bankruptcy confers full legal and equitable title upon the purchaser. *Id.* at ¶ 70.98[18]. When the Trustee conveyed his interest in the Aircraft by the Bill of Sale, he conveyed whatever title and rights he possessed. This included all the rights which were assertable by him as Trustee on behalf of creditors. *Cf. id.* at ¶¶ 70.04, n. 22, 70.97. So if there was a transfer relating to the Aircraft which was voidable under § 70(e), the Bill of Sale carried with it all of the Trustee's rights under that section. *See* 6 Remington on Bankruptcy ¶ 2571 (5th ed. J. Henderson 1952); *Marley v. United States*, 381 F.2d 738, 743, 108 Ct.Cl. 898 (1967). By delivery of the Bill of Sale, therefore, Wheatland would be the party entitled to as-

sert the § 70(e) claim, if the claim is transferrable. It is doubtful that § 70(e) rights can be transferred, as opposed to released. Here it does not matter since Wheatland had actual notice of the Lease and Assignment, consequently, as to it, the transfer was valid in any event under § 1403(c).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter.

2. Section 11(e) of the Bankruptcy Act, 11 U.S.C. § 29(e), bars actions under § 70(c) of the Bankruptcy Act, 11 U.S.C. § 110(c), brought more than two years after adjudication in bankruptcy.

3. The Trustee's claim under § 70(c) of the Bankruptcy Act, having been brought more than two years after adjudication, is barred by the statute of limitations, 11 U.S.C. § 29(e).

4. Claims under § 70(e) of the Bankruptcy Act, 11 U.S.C. § 110(e), may be brought either within two years of adjudication in bankruptcy, or within the period provided by the applicable state statute of limitations, whichever is longer.

5. The Trustee's claim under § 70(e) was brought within the six year applicable state statute of limitations, 12 P.S. § 31, and is timely brought, 11 U.S.C. § 29(e).

6. The recording provisions of the Federal Aviation Act, 49 U.S.C. § 1403, preempt those provisions of state law (Uniform Commercial Code) relating to recordation of security interests in aircraft. Other provisions of state law relating to validity and priority of security interests, and remedies available to holders of such interests, are not preempted by the Federal Aviation Act, 49 U.S.C. § 1406.

7. Except insofar as the recordation provisions are preempted by the Federal Aviation Act, the Uniform Commercial Code of Pennsylvania, 12A P.S. §§ 1–101, et seq., is applicable to the transaction here involved.

8. The filing and recording of the Aircraft Security Agreement between Philadelphia National Bank and Leasing Consultants Incorporated was pursuant to, and in compliance with, the recording provisions of the Federal Aviation Act requiring recording of conveyances affecting title to or interest in aircraft, 49 U.S.C. § 1403(a)(1), and the recording perfected Philadelphia National Bank's security interest in the Aircraft.

9. The purchase option granted to W. A. Wheatland Associates, Inc. by Leasing Consultants Incorporated was invalid as to Philadelphia National Bank, accordingly Philadelphia National Bank acquired from Leasing Consultants Incorporated a valid security interest in the Aircraft.

10. The Lease between Leasing Consultants Incorporated and W. A. Wheatland Associates, Inc. and the Assignment of said Lease by Leasing Consultants Incorporated to Philadelphia National Bank were not conveyances required to be recorded under the recording provisions of the Federal Aviation Act, 49 U.S.C. § 1403(a)(1).

11. The Assignment of Lease by Leasing Consultants Incorporated to Philadelphia National Bank did not convey title to the Aircraft to Philadelphia National Bank. Despite use of words of conveyance, the intent of the parties was that the Assignment was an assignment only of the Lease for collection purposes.

12. Under the applicable provisions of the Uniform Commercial Code of Pennsylvania, 12A P.S. §§ 9–101, et seq., the duly recorded and perfected Aircraft Security Agreement effectively granted to Philadelphia National Bank a perfected security interest in the proceeds of the Aircraft, including lease payments.

13. By the terms of the duly recorded Aircraft Security Agreement, Philadelphia National Bank was given the right, upon default, to exercise all rights and remedies provided by the Uniform Commercial Code of Pennsylvania with respect to the collateral, i. e., the Aircraft, including the right to seize and sell the collateral.

14. By the terms of the duly recorded Aircraft Security Agreement, the filing of a petition in bankruptcy by Leasing Consultants Incorporated constituted a default.

15. The Trustee's non-objection for a period of 30 months to Philadelphia National Bank's collection of rental payments in reduction of its loan, and the Trustee's disavowal of interest in the lease payments, caused the Philadelphia National Bank to forego other available remedies with respect to the collateral upon default, and the Trustee is estopped from recovering said payments.

16. The Bill of Sale delivered by the Trustee to W. A. Wheatland Associates, Inc. on August 12, 1971, conveyed to Wheatland whatever right, title and interest the Trustee had in the Aircraft. This conveyance effectively transferred to W. A. Wheatland Associates, Inc. whatever right the Trustee had in the Lease and the lease payments.

17. The Bill of Sale delivered by the Trustee to W. A. Wheatland Associates, Inc. on August 12, 1971, released whatever right the Trustee may have had to avoid any transfers relating to the Aircraft for failure of recordation.

18. Defendant, Philadelphia National Bank, is entitled to judgment in its favor.