In re FUNDING SYSTEMS ASSET MANAGEMENT CORPORATION and F/S Computer Corporation, Debtors.

FUNDING SYSTEMS ASSET MANAGEMENT CORPORATION and F/S Computer Corporation, Plaintiffs,

v.

CHEMICAL BUSINESS CREDIT CORP., Chemcredit, Inc. and Chemlease Worldwide, Inc., Defendants.

Bankruptcy No. 81–2858.
Adv. No. 85–0113.

United States Bankruptcy Court,
W.D. Pennsylvania.

March 12, 1990.

Daniel J. O'Neill, Walter, Conston, Alexander & Green, P.C., and David S. Pennock, Schoeman, Marsh, Updike & Welt, New York City, for debtors/plaintiffs.

Eric A. Schaffer, Reed Smith Shaw & McClay, Pittsburgh, Pa., and William M. Silverman, Otterbourg, Steindler, Houston & Rosen, New York City, Stephen I. Goldring, Office of U.S. Trustee, Pittsburgh, Pa., for defendants.

BERNARD MARKOVITZ, Bankruptcy Judge.

## COMMENT

There is a story that two of the greatest figures in our law, Justice Holmes and Judge Learned Hand, had lunch together and afterward, as Holmes began to drive off in his carriage, Hand, in a sudden onset of enthusiasm, ran after him, crying, "Do justice, sir, do justice." Holmes stopped the carriage and reproved Hand: "That is not my job. It is my job to apply the law."[1]

We are confident that this decision is in accord with the applicable law. We are less confident that it metes out perfect justice.

## MEMORANDUM OPINION

This adversary proceeding was commenced prior to confirmation of Debtors' Plan of Reorganization. In same, Debtors Funding Systems Asset Management Corporation and F/S Computer Corporation (jointly referred to as "FS"), seek, pursuant to 11 U.S.C. § 544(a)(1), to avoid security interests in their rights to twelve (12) computer leases granted to Defendants Chemical Business Credit Corporation, Chemcredit, Inc. and Chemlease Worldwide, Inc. (collectively referred to as "Chemical"). It further seeks, pursuant to 11 U.S.C. § 547(b), to avoid monthly rental payments made directly to Chemical by the lessees of the computer equipment during the 90–day period immediately preceding the filing of FS' bankruptcy petition. Finally, FS seeks, pursuant to 11 U.S.C. § 550, to recover the value of these avoided transfers.

FS contends that, as a hypothetical lien creditor, it is entitled to avoid Chemical's security interests in the twelve leases pursuant to 11 U.S.C. § 544(a)(1) as Chemical failed to perfect its security interests as of the date on which FS filed its bankruptcy

---

**1.** See E. Sergeant, *"Justice Touched With Fire"*, in *Mr. Justice Holmes*, 206–07 (F. Frankfurter ed. 1931); H. Shriver, *"What Gusto: Stories and* *Anecdotes About Justice Oliver Wendell Holmes"*, 10 (privately printed 1970).

petitions. FS further contends that it is entitled to avoid monthly rental payments made directly to Chemical by the lessees of the equipment during the 90–day period prior to bankruptcy as being a preference pursuant to 11 U.S.C. § 547(b).

Chemical responds that FS is not entitled to avoid the above security interests because neither the equipment leases nor the proceeds derived therefrom were "property of the estate". Chemical, in the alternative, further claims that it perfected its security interests in the leases by virtue of its possession of the proceeds of the leases. Finally, Chemical maintains that, even if FS were entitled to avoid the above transfers, any recovery by it would constitute a windfall and, consequently, is precluded by equity.

## I.

### FACTUAL BACKGROUND

Funding Systems Asset Management Corporation is a wholly-owned subsidiary of FSC Corporation. F/S Computer Corporation is a wholly-owned subsidiary of Funding Systems Asset Management Corporation. Defendants Chemical Business Credit Corporation, Chemcredit, Inc., and Chemlease Worldwide, Inc. are wholly-owned subsidiaries of Chemical Bank of New York.

Prior to filing for bankruptcy on October 23, 1981, FS had been engaged in leveraged leasing of computer equipment. It first would lease computer equipment to various lessees and then would obtain the necessary financing to purchase the equipment.

Subject to certain variations to be noted below, the series of transactions surrounding the twelve leases at issue (the "challenged leases") were similar in certain relevant respects.

FS would first locate a lessee which sought to lease computer equipment (the "user-lessee"). FS and the user-lessee would execute a master lease, which set forth the *general* terms and conditions, wherein FS would lease the equipment to the user-lessee. The master lease did *not*, however, provide such specifics as the equipment to be leased, the amount of the rental payments, the terms of the lease, etc. These specifics were provided by additional documents known as equipment schedules, which referred to and incorporated the provisions of the master lease. It was not uncommon for numerous equipment schedules to be executed by FS and a user-lessee over a period of years after the execution of the underlying master lease.

Since FS did not maintain an inventory of computer equipment, it had to purchase the equipment which the user-lessee had leased. FS would approach a lending institution, such as Chemical, in order to finance a portion of the purchase price of the required equipment.

In late–1980 and early–1981, FS requested that Chemical lend it a portion (usually 70%) of the purchase price of the equipment in the twelve challenged leases. The requested amount typically equalled the discounted, present value of the total stream of rental payments to which FS was entitled under the user lease.

The documentation for each of the twelve challenged leases included a Note and Security Agreement, a collateral Assignment of Lease from FS to Chemical, and an Acknowledgment of Assignment executed by FS and the user-lessee.

In the Note and Security Agreement, FS agreed to repay the loan, with interest, in monthly installments which equalled the amount of monthly rental payments to which FS, as lessor under the user lease, was entitled under the applicable equipment schedule. The Note and Security Agreement also granted Chemical a security interest in: (1) FS' rights under the applicable master leases and/or equipment schedules, including FS' right to receive rental payments from the user-lessee; and (2) the underlying computer equipment which FS was to purchase, in part, with the loan proceeds.

FS also executed, as further security for the loan, a collateral Assignment of Lease in favor of Chemical pursuant to which Chemical was assigned all of FS' rights, but none of its obligations, under the mas-

ter leases and equipment schedules, and by which Chemical became entitled to receive the stream of rental payments directly from the user-lessee.

Finally, FS and the user-lessee executed an Acknowledgement of Assignment in which the user-lessee acknowledged that FS' rights under the leases/schedules, including the right to receive rental payments, had been collaterally assigned to Chemical as security for repayment of the loan, and in which the user-lessee agreed to make the required rental payments directly to Chemical.

The remaining funding needed for the purchase of the computer equipment (which typically amounted to thirty percent (30%) of the total purchase price) was derived from the sale by FS of its title to the computer equipment to a third-party equity owner. (FS typically utilized its own working capital to fund this portion of the purchase price and subsequently would rely on this equity sale to replenish its working capital.)

FS typically would sell its title to the computer equipment, subject to the rights of the user-lessee and Chemical's security interest, to a "middle company". The middle company would in turn sell title to the equipment, subject to the rights of the user-lessee and Chemical's security interest, to another entity known as the "equity owner". The equity owner would then enter into a leaseback agreement with FS, pursuant to which FS obtained a lessee's rights in the computer equipment for a term which exceeded, usually by a number of years, the term of the initial user lease. FS also customarily would enter into a remarketing agreement pursuant to which FS was authorized to remarket the equipment for a fee at the terminations of the leaseback period.

FS' ultimate objective with respect to these transactions was to reach that point during the leaseback, known as the "window" or "wrap" period, when its loan with Chemical had been paid in full and FS had the right to further lease the equipment and thus could generate a continuing flow of rental payments. FS typically negotiat-ed extensions of the original user lease or leased the equipment to another party during the "window" period. Clearly this "window" or "wrap" period was of substantial monetary value to Debtor.

When FS was the initial lessor in a master lease, it executed with the lessee *three* (3) master leases in original form—i.e., bearing original ink signatures. The distribution of these master leases was as follows: one to the user-lessee; one to FS; and one to Chemical. Similarly, when FS was the initial lessor in an equipment schedule, it executed with the user-lessee *three* (3) equipment leases in original form. The distribution of these equipment schedules was the same as for the master leases.

Preparation, circulation, and distribution of the master leases and equipment schedules for the twelve challenged leases was handled by FS' Contract Administration Department. Once they had been prepared, three identical master leases and/or equipment schedules were transmitted to the user-lessee for execution and return to FS. Upon their receipt by FS, an authorized officer of FS would execute the three master leases and/or equipment schedules. The effect of this procedure was that *three identical sets* of these documents would be executed. Once the documents had been executed by FS, its Contract Administration Department then would transmit one completed set of originals to the user-lessee, would retain one set for its own files, and would transmit the third set of completed originals (together with any other required documentation, such as UCC–1 financing statements) to Chemical. It was *not* Chemical's practice to require that *all* sets of originals be transmitted to it.

It was the practice of Chemical to require that it receive an original master lease, when one was available. Original master leases were not available in every instance, however. As had been pointed out, it often happened that numerous equipment schedules, all of which made reference to the same master lease, would be executed. The original master lease often could not be transmitted to Chemical because it already had been transmitted to

some other lending institution which had financed one (or more) of the prior equipment schedules. In such instances, Chemical received (and accepted) a photocopy of the underlying master lease.

With respect to the six (6) challenged leases in which a third party had been the initial lessor and FS had become the lessor by virtue of an absolute assignment, Chemical never undertook to determine the number of third party assignments that had been executed. It was not the policy of Chemical to require possession of all original documents concerning such assignments.

None of the original master leases, equipment schedules, or third-party assignments bore any markings which identified one of them as the "original" and the others as "duplicate originals" or "duplicates".

FS and Chemical have stipulated to the following distribution and retention of lease documentation:

Challenged Lease No. 1
Barry Wehmiller Schedule No. 1

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Master Lease Agreement between Systems Leasing Corporation and Barry Wehmiller Company dated 06/27/80 | Original | Copy |
| 2. Equipment Schedule No. 1 to Lease Agreement dated 06/27/80 | Original | Copy |
| 3. Assignment, Assumption and Indemnity Agreement between Systems Leasing Corporation and F/S Computer Corporation dated 08/29/80 | Original | Original |

Challenged Lease No. 2

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Lease Agreement between F/S Computer Corporation and The Nestle's Company, Inc. dated 09/30/80 | Original | Copy |
| 2. Equipment Schedule 01 to Lease Agreement dated 09/30/80 | Original | Original |
| 3. Equipment Schedule 01A to Lease Agreement dated 09/30/80 | Original | Original |

Challenged Lease No. 3
Nestle's Schedule No. 02

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Lease Agreement between F/S Computer Corporation and The Nestle's Company, Inc. dated 09/30/80 | Original | Copy |
| 2. Equipment Schedule No. 2 to Lease Agreement dated 09/30/80 | Original | Original |

Challenged Lease No. 4
Norfolk & Western Schedule No. 1

| Documents | Version | |
|---|---|---|
| | Chemical | FS |
| 1. Master Lease Agreement between F/S Computer Corporation and Norfolk & Western Railway Company dated 10/28/80 | Original | Original |
| 2. Equipment Schedule No. 1 to Master Lease Agreement dated 10/28/80 | Original | Original |

Challenged Lease No. 5
Rorer Schedule No. 5

| Documents | Version | |
|---|---|---|
| | Chemical | FS |
| 1. Lease Agreement between J.M. Randolph & Associates, Inc. and William Rorer, Inc. dated 12/10/76 | Certified Copy [2] | Copy |
| 2. Equipment Schedule No. 9 to the Lease Agreement dated 12/20/76 | Original | Original |
| 3. Assignment, Assumption and Indemnity Agreement between J.M. Randolph & Associates, Inc. and Funding Systems Leasing Corporation dated as of 05/24/77 (all schedules) | Copy | Original |

Challenged Lease No. 6
Rorer Schedule No. 6

| Documents | Version | |
|---|---|---|
| | Chemical | FS |
| 1. Lease Agreement between J.M. Randolph & Associates, Inc. and William Rorer, Inc. dated 12/20/76 | Certified Copy | Copy |
| 2. Equipment Schedule No. 6 to Lease Agreement dated 12/20/76 | Original | Original |
| 3. Assignment, Assumption and Indemnity Agreement between J.M. Randolph & Associates, Inc. and Funding Systems Leasing Corporation dated 05/24/77 (all schedules) | Copy | Original |

2. As used herein, an original is a document bearing original ink signatures. A certified copy is a photocopy without ink signatures whose authenticity as a true and correct photocopy of an original was certified to Chemical by FS. A copy is something other than an original or a certified copy.

Challenged Lease No. 7
Nordstrom Schedule No. 4

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Lease Agreement between Funding Systems Leasing Corp. and Nordstrom, Inc. dated 06/01/79 | Certified Copy | Copy |
| 2. Equipment Schedule No. 4 to Lease Agreement dated 06/01/80 | Original | Original |

Challenged Lease No. 8
Nordstrom Schedule No. 3

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Lease Agreement between Funding Systems Leasing Corp. and Nordstrom, Inc. dated 06/01/79 | Certified Copy | Copy |
| 2. Equipment Schedule No. 3 to Lease Agreement dated 06/01/79 | Original | Original |

Challenged Lease No. 9
Nordstrom Schedule No. 5

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Lease Agreement between Funding Systems Leasing Corp. and Nordstrom, Inc. dated 06/01/79 | Certified Copy | Copy |
| 2. Equipment Schedule No. 5 to Lease Agreement dated 06/01/79 | Original | Original |

Challenged Lease No. 10
Russell Schedule No. 30

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Equipment Schedule No. A–006 between Analysis International Co., Inc. and Russell Mills, Inc. dated 09/01/72 | Certified Copy | Copy |
| 2. Machine Schedule No. 30 to Lease Agreement No. A–006 dated 09/01/72 | Original | Copy |
| 3. Assignment, Assumption and Indemnity Agreement between Analysis International Co., Inc. and Funding Systems Asset Management Corporation dated 12/02/80 | Copy | Original |

Challenged Lease No. 11
Russell Schedule No. 32–B

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Equipment Lease No. A–006 between Analysis International Co., Inc. and Funding Systems Asset Management Corporation dated 09/01/72 | Certified Copy | Copy |
| 2. Machine Schedule No. 32–B to Lease Agreement A–006 dated 09/01/72 | Original | Copy |
| 3. Assignment, Assumption and Indemnity Agreement between Analysis International Co., Inc. and Funding Systems Asset Management Corporation dated 04/15/81 | Copy | Original |

Challenged Lease No. 12
Safeco Schedule No. 04

| Documents | Version | |
| --- | --- | --- |
| | Chemical | FS |
| 1. Lease Agreement between Funding Systems Leasing Corp. and Safeco Insurance Company of America dated 08/23/77 | Certified Copy | Copy |
| 2. Equipment Schedule No. 04 to Lease Agreement dated 8/23/77 | Original | Original |

---

FS and Chemical have stipulated that the following rental payments were received by Chemical *after* the bankruptcy petition was filed on October 23, 1981:

| Challenged Lease | Postpetition Rental Payments |
| --- | --- |
| No. 1 | $ 154,768.00 |
| No. 2 | 132,775.69 |
| No. 3 | 196,627.57 |
| No. 4 | 1,824,000.00 |
| No. 5 | 452,727.44 |
| No. 6 | 40,984.81 |
| No. 7 | 41,633.29 |
| No. 8 | 173,062.74 |
| No. 9 | 56,781.42 |
| No. 10 | 78,400.00 |
| No. 11 | 90,000.00 |
| No. 12 | 1,875,286.90 |
| Total | $5,117,047.86 |

It has also been stipulated that Chemical received the following rental payments during the 90–day period immediately preceding the filing of the bankruptcy petition:

| Challenged Lease | Prepetition Payments 07/23/81 To 10/23/81 |
|---|---|
| No. 1 | $ 9,400.56 |
| No. 2 | 7,491.51 |
| No. 3 | 14,057.44 |
| No. 4 | 192,000.00 |
| No. 5 | 34,585.68 |
| No. 6 | 2,924.40 |
| No. 7 | 6,195.79 |
| No. 8 | 8,961.48 |
| No. 9 | 8,438.04 |
| No. 10 | 8,400.00 |
| No. 11 | 9,000.00 |
| No. 12 | 113,276.90 |
| Total: | $415,276.90 |

Reorganization of FS was in large part dependent upon the successful reorganization of its parent, FSC Corporation, whose Plan of Reorganization was confirmed by this Court in May of 1985. Once FSC Corporation's Plan of Reorganization was confirmed, negotiations were undertaken with a number of potential outside investors in FS. Agreement eventually was reached with a group of investors known as FSAM Associates, Ltd. ("Associates").

FS submitted a proposed Disclosure Statement and Plan of Reorganization to the Court in November of 1985. The Plan was confirmed by the Court on December 18, 1985. Although the Plan was confirmed before this adversary action had been decided, the Court retained jurisdiction over it to determine whether Chemical had perfected its security interest in the twelve leases.

The Plan provided, among other things, that: all assets and liabilities of Funding Systems Asset Management Corporation and F/S Computer Corporation would be merged; that Associates, in accordance with the Stock Purchase Agreement with FS, would pay FS $1,000,000.00 at the closing and an additional $1,000,000.00 one (1) year after the closing; that all of FS' existing equity securities would be cancelled and FS would issue 575,000 shares of new Class A Common Stock and 60,000 shares of Dedicated Preferred Stock; that Associates would receive ninety-five percent (95%) and FS' existing management would receive five percent (5%) of the newly issued Common Stock; that the claims of unsecured creditors would be satisfied by *pro rata* distribution of the $2,000,000.00 cash contribution by Associates *and* by *pro rata* distribution of the newly issued Dedicated Preferred Stock.

The Plan further provided that if Chemical's security interests in the twelve leases were found by the Court to be perfected, Chemical would be treated as a Class 3 Secured Creditor. It further provided that if Chemical's security interests were found to be *un* perfected, it would be treated as a Class 7 Unsecured Creditor with claims in excess of $10,000.00.

Chemical received notice, *inter alia*, of the hearing relating to Plan confirmation and attended same. Chemical did not object to FS' proposed Plan of Reorganization.

Pursuant to the Plan as confirmed, FS' unsecured creditors have received *pro rata* cash distributions amounting to approximately $.045 per dollar of unsecured claim. In addition, they have received *pro rata* distributions of the 60,000 shares of Dedicated Preferred Stock provided for in the reorganization of FS.

Each share of Dedicated Preferred Stock is entitled to payment of a noncumulative dividend out of the surplus or net profit legally available for dividends at the annual rate of $6.00 per share through and includ-

ing December 31, 1990. Thereafter, each share is entitled to receive *cumulative* dividends out of FS' surplus profit that is legally available for dividends at the rate set forth below:

| | |
|---|---|
| 1991: | $ 8.00 |
| 1992: | 8.50 |
| 1993: | 9.00 |
| 1994: | 9.50 |
| 1995: | 10.00 |
| 1996: | 10.50 |
| 1997: | 11.00 |
| 1998: | 11.50 |
| 1999: | 12.00 |

In the event of liquidation, dissolution, or winding up of FS, holders of Dedicated Preferred Stock are entitled to receive payment at the rate of $100.00 per share plus any cumulative unpaid dividends. Finally, FS may, at its option, redeem all or any part of the Dedicated Preferred Stock then outstanding at any time after December 31, 1990 for $100.00 per share plus any unpaid accumulated dividends.

No dividends have yet been paid to the holders of Dedicated Preferred Stock. Moreover, none of it has been redeemed. If the Dedicated Preferred Stock were to be redeemed at the earliest possible date prior to its entitlement to cumulative dividends, the total cost of redemption would be $6,000,000.00. Redemption of the stock in 1999 would cost FS $11,400,000.00. The Plan contains no provision for additional payments to unsecured creditors other than through redemption of the Dedicated Preferred Stock.

## II.

### PROPERTY OF THE ESTATE

The threshold issue presented in this case is whether Debtor had a property interest in the challenged leases and the rental payments derived therefrom as of the commencement of this case.

11 U.S.C. § 544(a) provides in relevant part that:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee, or of any creditor, the rights and powers of, and may avoid *any transfer of property*

> *of the debtor* ... that is avoidable by—
> ...

11 U.S.C. § 547(b) provides in relevant part that:

> ... [The] trustee may avoid *any transfer of an interest of the debtor in property—* ...

As the express language of 11 U.S.C. §§ 544(a) and 547(b) makes clear, it is a precondition of their applicability that the transfer which the trustee (or the debtor) seeks to avoid be "property of the debtor".

Chemical opines that Debtor's claims must fail because the user leases and the monthly rental payments were *not* property of Debtor as of the commencement of this case.

This contention is incorrect. Both the user leases and the rental payments were property of the Debtor, as that concept is understood under the Bankruptcy Code.

Section 541 of the Bankruptcy Code specifies what is and is not property of the debtor's estate. Most importantly, it includes "... all legal or equitable interests of the debtor in property as of the commencement of the case". 11 U.S.C. § 541(a)(1).

The scope of § 541(a)(1) is broad and pervasive. *U.S. v. Whiting Pools*, 462 U.S. 198, 204 n. 9, 103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515 (1983).

> It includes *all kinds of property* ... tangible or intangible, ... and all other forms of property specified in § 70(a) of the Bankruptcy Act ... The debtor's interest also includes "title" to property, which is an interest, just are a possessory interest or leasehold interest.

H.R.Rep. No. 595, 95th Cong. 1st Sess., 367–68 (1970); *also* U.S.Code Cong. & Ad. News 1978, pp. 5787, 6323.

■ It is well settled that a leasehold interest is property of the estate if the debtor is the *lessee* of property as of the commencement of the case. *In re Babco*, 28 B.R. 656, 658 (W.D.Pa.1983); *see also, In re 48th Street Steakhouse, Inc.*, 61 B.R. 182, 187 (Bankr.S.D.N.Y.1986), *aff'd*, 77 B.R. 409 (S.D.N.Y.1987), *aff'd*, 835 F.2d 427 (2nd Cir.), *cert. den.*, 485 U.S. 1035, 108

S.Ct. 1596, 99 L.Ed.2d 910 (1988). The same principle is no less true where the debtor is the *lessor* under a lease at the time of filing.

Careful review of the relevant lease documentation indicates that Debtor had retained its interest as lessor in each of the twelve challenged leases as of the time of the filing of the bankruptcy petition.

## A. *The User Leases*

### *Challenged Lease No. 1*

■ Debtor was the user lessor; Barry Wehmiller Company was the user-lessee; and Horizon Leasing Company was the so-called "middle company".

Although Debtor did transfer both the computer equipment *and* its rights as lessor under the user lease to Horizon Leasing, it contemporaneously reacquired the latter from Horizon Leasing.

The Bill of Sale, executed on September 30, 1981, recited that Debtor had:

... bargained, sold, transferred, assigned, set over and conveyed ... all of the personal property (the "Equipment") listed on the schedule attached hereto *as well as all of ... [Debtor's] rights and interests to the lease referred to in such Schedule 9 of the "Lease".*

TO HAVE AND TO HOLD the Equipment *and the Lease* unto the Buyer, its successors and assigns, to its own and their own use and behalf forever. (Emphasis added.)

(JTX–1–26).

The sale was made pursuant to a Purchase Agreement between Debtor and Horizon Leasing which was executed that same day. *See* ¶ 1.1 of the Purchase Agreement (JTX 1–25).

Debtor and Horizon Leasing also contemporaneously executed an Agreement of Lease whereby Horizon leased back the computer equipment to Debtor. In addition, Horizon assigned to Debtor *all of its rights as lessor under the user lease.* Section 2 of the Assignment of Lease provided in pertinent part as follows:

*Property Leased.* Lessor [Horizon Leasing] ... hereby demises and lets to Lessor [Debtor] the equipment, listed on the Equipment Schedule attached hereto (the "Equipment"). *In connection therewith, Lessor hereby assigns to Lessee all of its rights and interests as Lessor under the Existing Underlying Lease.* (Emphasis added.)

(JTX 1–28).

Debtor, in effect, had contemporaneously "stepped back into its own shoes" as lessor under the user lease. Moreover, it continued to occupy this position until the filing of the bankruptcy petition. Debtor made no further transfer of its rights as lessor under the user lease once it had taken them back.

### *Challenged Lease Nos. 2–5 and 7–11*

These challenged leases are similar to Challenged Lease No. 1 in that Debtor did convey title to the computer equipment to a middle company. They differ from Challenged Lease No. 1, however, in that Debtor did not at any time transfer its rights as lessor under these user leases. Chemical's assertion that Debtor also had transferred its rights as lessor under the user leases in these instances is incorrect.

Challenged Lease No. 2 is representative of the challenged leases in this category. Debtor was the user lessor in this instance; The Nestle Company was the user-lessee; and Equitable Leasing Company was the middle company.

The language in the Bill of Sale between Debtor and Equitable Leasing in Challenged Lease No. 2 differs from that in Challenged Lease No. 1. The first paragraph of the Bill of Sale in this challenged lease recites that Debtor had:

.... bargained, sold, transferred, assigned, set over and conveyed ... all of the personal property (the "Equipment") listed on the Schedule attached.

TO HAVE AND TO HOLD the Equipment unto the Buyer, its successors and assigns, to its and their own use and behalf forever.

(JTX 2–19).

Unlike the Bill of Sale in Challenged Lease No. 1, this Bill of Sale does *not* recite that Debtor was transferring its

rights as lessor under the user lease to the middle company.

The Purchase Agreement between Debtor and Equitable Leasing likewise makes no reference to Debtor's rights as lessor under the user lease. *See* ¶ 1.1 of the Purchase Agreement (JTX 2–18).

The pattern in all of the other challenged leases in this category, i.e., Challenged Lease Nos. 3–5 and 7–11, mirrors that set forth in Challenged Lease No. 2. In none of them did the Debtor transfer its rights as lessor under the user lease to a middle company. The only transfers that occurred involved Debtor's title to the computer equipment.[3]

### Challenged Lease No. 6

This lease is *sui generis*. Unlike the other eleven challenged leases, no "equity transactions" took place. That is to say, there was no middle company (and, consequently, no ultimate equity owner) to whom Debtor conveyed or transferred either title to the computer equipment or its rights as lessor under the user leases. Debtor at all times retained both title to the equipment and its rights under the user leases.

### Challenged Lease No. 12

Debtor was the user lessor; SAFECO was the user-lessee; FSC Associates Limited Partnership was the first middle company; FSAM Associates Limited Partnership was the second middle company; Tulip Leasing Associates was the ultimate equity owner.

As was the case in Challenged Lease No. 1, Debtor initially conveyed title to the computer equipment *and* its rights as lessor under the user lease. The Bill of Sale, which was executed on June 30, 1981, recited that Debtor had:

... bargained, sold, transferred, assigned, set over and conveyed unto the Buyer [FSC Associates Limited Partnership] ... all of the personal property (the "Equipment") listed in the Schedule attached hereto, *together with all of the Seller's [Debtor's] rights, title and interest (a) as lessor, to and under the agreement of lease (the "lease") described in the Schedule attached hereto* ... .

TO HAVE AND TO HOLD the Equipment *and Seller's right, title and interest in, to and under the lease ... unto the Buyer, its successors and assigns, to its and their own use and behalf forever.* (Emphasis added.)

(JTX 2–24).

That same day, FSC Associates Limited Partnership then conveyed title to the computer equipment, but *not* the rights as lessor under the user lease between Debtor and SAFECO, to FSAMC Associates Limited Partnership, the second middle company.

The Bill of Sale recited that FSC Associates Limited Partnership had:

... sold, assigned, set over and delivered ... unto the Buyer [FSAM Associates Limited Partnership] all right, title and interest in and to the personal property more particularly described on Schedule A annexed hereto (*the "Equipment"*) ...; to have and to hold the same unto

---

**3.** The other "equity documents" which show that Debtor conveyed title to the computer equipment but *not* its rights as lessor under the user leases in the other challenged leases falling in this category are as follows:

| Challenged Lease | Purchase Agreement | Bill of Sale |
| --- | --- | --- |
| No. 3 | Same as CL No. 2 | Same as CL No. 2 |
| No. 4 | JTX 4–21 | JTX 4–22 |
| No. 5 | JTX 5–23 | JTX 5–24 |
| No. 7 | JTX 7–19 | * |
| No. 8 | JTX 8–16 | JTX 8–17 |
| No. 9 | Same as CL No. 8 | Same as CL No. 8 |
| No. 10 | JTX 10–22 | JTX 10–23 |
| No. 11 | Same as CL No. 5 | Same as CL No. 5 |

the Buyer, its successors and assigns, forever.

(JTX 12–26).

Paragraph 1 of the Purchase Agreement contains comparable language. *See* ¶ 1 of the Purchase Agreement (JTX 12–25).

Also on that same day, FSAMC Associates Limited Partnership then conveyed title to the computer equipment to Tulip Leasing Associates. *See* JTX 12–29. Tulip Leasing Associates in turn contemporaneously entered into a leaseback arrangement with FSC Associates Limited Partnership in regards to the computer equipment. *See* JTX 12–34.

On March 8, 1985, FSC Corporation, the parent company of Debtor, filed before this Court a Petition For Authority To Transfer Property And Avoid Alleged Partnership Agreements. It was alleged that F/S Computer Corporation had executed on June 1, 1981, an Agreement of Limited Partnership with FSC Corporation and AJS Leasing Corporation to form FSC Associates Limited Partnership. According to the Agreement, F/S Computer Corporation was an 89.9% limited partner; FSC Corporation was a 10% general partner; and AJS Leasing was a .1% general partner. The Agreement purported to create a Pennsylvania limited partnership (¶¶ 9, 10). It was further alleged that a Certificate of Limited Partnership had not been filed until after commencement of the bankruptcy case on October 23, 1981 (¶ 20). Finally, it was alleged that, since FSC Associates Limited Partnership had not been duly formed, the conveyance by F/S Computer Corporation to FSC Associates Limited Partnership on June 30, 1981 was, in effect, a conveyance to itself (¶ 25).

Petitioner sought an Order:

(a) Authorizing the FSC Partnership [i.e., the FSC assets and liabilities] to transfer all of its assets and liabilities to FSCC [i.e., to Debtor] to the effect that, *nunc pro tunc*, the FSC Partnership is void and of no force and effect *and all transactions entered into by the FSC Partnership shall be deemed to be transactions entered into directly by FSCC (Debtor)* and FSC and AJS shall have no assets or liabilities in connection with the transactions described herein. (Emphasis added.)

The Order was entered, without any modification, on March 12, 1985. No appeal of the Order was ever taken by any interested party. Accordingly, this Order and its effect appear to be the law of this case.

When Debtor transferred both title to the computer equipment and its rights as lessor under the user lease to FSC Associates Limited Partnership on June 30, 1981, pursuant to the Purchase Agreement and Bill of Sale, Debtor was "transferring" these interests to *itself*. That is to say, Debtor had *not* transferred them to another entity by virtue of these transactions. In addition, Debtor in effect *remained* the lessor under the user lease until October 23, 1981, when the bankruptcy petition was filed. FSC Associates Limited Partnership (and hence Debtor) did not thereafter transfer its rights as lessor under the user lease to any other entity. These rights had been retained by FSC Associates Limited Partnership and, accordingly, by Debtor.

In conclusion, and from the foregoing analysis, it appears clear that Debtor did in fact retain a property interest in the personalty in question so as to have a basis to pursue this action.

## B. *The Rental Payments*

Chemical contends that the rental payments derived from the user leases which were paid by the user-lessees directly to Chemical during the 90–day period immediately prior to the filing of Debtor's bankruptcy petition were not "property of the debtor" and therefore are not avoidable as preferential transfers. Chemical relies on the doctrine of "earmarking" in support of its position.

A transfer by a debtor of its property to a creditor on account of an antecedent debt within ninety (90) days of filing for bankruptcy, whereby the creditor receives more than it would have received in a Chapter 7 liquidation proceeding, is an avoidable preferential transfer. *See* 11 U.S.C. § 547(b). Such a transfer is avoid-

able as a preference only if the property which is transferred belongs to the debtor. 4 *Collier on Bankruptcy* ¶ 547.03 at p. 22 (15th ed. 1989). This principle also applies where the transfer is made by a person other than the debtor. A transfer of money by a third person to a creditor of the debtor which does not issue from the debtor's property is not a preferential transfer. *See* 4 *Collier on Bankruptcy* ¶ 547.03 at p. 24 (15th ed. 1989).

Chemical's position is untenable for a number of reasons.

■ To begin with, the rental payments in question are, as Chemical itself evidently concedes, "proceeds" of the lease collateral. Proceeds or rents derived from property of a debtor's estate also are property of the estate. 11 U.S.C. § 541(a)(6).

Also, Chemical's reliance upon the earmarking doctrine is misplaced because it is inapplicable in this case. Earmarking applies only to a specific sort of transaction:

> If all that occurs in a "transfer" is *the substitution of one creditor for another*, no preference is created because the debtor has not transferred property of his estate; *he still owes the same sum to a creditor*, only the identity of the creditor has changed. *This type of transaction is referred to as "earmarking"* ... (Emphasis added.)

*Coral Petroleum v. Banque Paribas–London*, 797 F.2d 1351, 1356 (5th Cir.), *rehrg. den.*, 801 F.2d 398 (5th Cir.1986).

■ As this passage makes clear, the earmarking doctrine applies only to situations in which one creditor of a debtor is substituted for another. More precisely, it applies only in situations where:

> ... a third person makes a *loan* to a debtor specifically to enable him to satisfy the claim of a *designated creditor*, the proceeds never become part of the debtor's assets ... The rule is the same regardless of whether *the proceeds of the loan* are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of the claim, *so long as such proceeds are clearly "earmarked"*. (Emphasis supplied.)

4 *Collier on Bankruptcy*, ¶ 547.03[2] at p. 26 (15th ed. 1989).

■ It is a prerequisite of the earmarking doctrine that the funds used to pay an initial creditor are derived from a loan or other extension of credit from a third party. *In re Hartley*, 825 F.2d 1067, 1069 (6th Cir.1987) (*citing Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2nd Cir. 1938).

■ A fundamental inquiry in determining whether the earmarking doctrine applies is whether the transfer in question has diminished the debtor's estate. *In re New York City Shoes, Inc.*, 98 B.R. 725, 728 (Bankr.E.D.Pa.1989), *reversed on other grounds*, 880 F.2d 679 (3rd Cir.1989). The underlying rationale for the earmarking doctrine is that, if other creditors are not adversely affected by such a transfer, then there is no basis for avoiding it as a preference. *In re New York City Shoes, Inc.*, *supra* at 728–29. If all that results is the *substitution of one creditor for another*, no avoidable preference has taken place because no transfer of property of the debtor has occurred. The debtor still owes the same sum to a creditor. The only change is in the identity of the creditor. *Coral Petroleum*, supra at 1356. Payment of the money in such an instance would *not* diminish the debtor's estate.

■ The earmarking rule does not apply to the present case. The payments made by the user-lessees, although made directly to a creditor of Debtor, were *not loans* by the user-lessees to Debtor which had been specifically designated to satisfy the debts owed by Debtor to Chemical. Rather, the payments were for rental of the computer equipment leased from Debtor. The user-lessees were obligees of Debtor under the user leases, and were *not* its creditors. Payment of the rentals directly to Chemical by Debtor did *not* result in the mere substitution of one set of creditors, i.e., the user-lessees, for another creditor, i.e., Chemical. Moreover, although the payments in question were made directly to Chemical, they were *owed to Debtor* under the user leases

for rental of the computer equipment. Payment of these rentals directly to Chemical in effect depleted Debtor's estate and was injurious to Debtor's other creditors in that it diminished those assets of Debtor which could have been used to satisfy them.

### III.

### PERFECTION

The security interests granted to Chemical by Debtor in each of the twelve challenged lease transactions are subject to Article 9 of the Uniform Commercial Code (hereinafter "UCC"), including its perfection provisions. *See* 13 Pa.C.S.A. § 9102 (Purdon's 1984). As a general matter, a financing statement must be filed to perfect a security interest. Filing is not required, however, to perfect a security interest in collateral which is in the possession of the secured party pursuant to 13 Pa.C.S.A. § 9305. *See* 13 Pa.C.S.A. § 9302(a)(1) (Purdon's 1984).

The Note and Security Agreement in each of the twelve challenged leases expressly authorized Chemical to perfect its security interest by filing financing statements. Moreover, Debtor provided Chemical with signed UCC–1 financing statements for each challenged transaction in order that Chemical could perfect by filing.

If a debtor has its place of business in only one (1) county in Pennsylvania, a dual filing is required with the Secretary of the Commonwealth *and* with the Prothonotary of that county in order to perfect by filing. *See* 13 Pa.C.S.A. § 9401(a)(3) (Purdon's 1984). However, instead of filing with the Prothonotary of Allegheny County, where Debtor had its sole place of business, Chemical erroneously filed with the Recorder of Deeds of Allegheny County. Failure to comply with the requirement of § 9401(a)(3), where applicable, is fatal to a claim of perfection by filing. *In re Bethlehem Concrete Corp.*, 306 F.Supp. 1047, 1048 (E.D.Pa.1969).

Chemical *concedes* that it failed to perfect its security interests by filing. It contends, however, that it nevertheless is per-

fected by possession pursuant to 13 Pa.C.S.A. § 9305, which provides in relevant part:

A security interest in ... *money* ... or *chattel paper* may be perfected by the secured party's *taking possession of the collateral.* ... A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this division. (Emphasis added.)

### A. *Chattel Paper*

Chemical possessed an original of the equipment schedules for all twelve of the challenged leases at issue here. Debtor, by contrast, possessed an original of the equipment schedules for Challenged Lease Nos. 2–9 and 12, and possessed a copy of the equipment schedules for Challenged Lease Nos. 1, 10, and 11.

According to Chemical, *only* the equipment schedules executed in the twelve challenged leases qualify in this case as chattel paper for purposes of § 9305. Chemical further maintains that its possession of an original equipment schedule for each challenged lease, *regardless of the number of other originals which may have been executed,* is sufficient to satisfy the perfection requirement of § 9305.

The chattel paper which Chemical must possess for purposes of § 9305 consists in this case of more than the various equipment schedules. Chemical's construal of what qualifies as chattel paper in this context is unduly restrictive.

Chattel paper is defined elsewhere in the UCC as:

A writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods ... When a transaction is evidenced both by such ... a lease and by an instrument or a series of instruments, the group of writing taken together constitutes chattel paper. (Emphasis added.)

13 Pa.C.S.A. § 9105 (Purdon's 1984).

Each of the challenged transactions in this case is evidenced by a group of writ-

ings, which together constitute the chattel paper. Specifically, the chattel paper includes the equipment schedules, the master leases, and the assignment, assumption and indemnity agreements (where they exist).

Both the master leases and the equipment schedules constitute chattel paper. Only the equipment schedule specifies the equipment to be leased, the amount of the monthly rental payments, and the terms of the lease. The master lease contains none of these provisions but, instead, sets forth general terms and conditions concerning such matters as the use of the equipment, maintenance and repairs, inspection, warranties, risk of loss, etc. The equipment schedule, however, does not contain these terms and provisions. Rather, it incorporates by reference those general provisions of the master lease as though they were fully set forth in the equipment schedule. The master lease and the equipment schedule, when taken together, evidence a monetary obligation and a lease of specific goods.

In addition, the assignment, assumption and indemnity agreements in Challenged Lease Nos. 1, 5, 6, 10, and 11 also qualify as chattel paper in this case.

When a transaction is evidenced by both a lease and an instrument, the group of writings taken together constitutes chattel paper. *See* 13 Pa.C.S.A. § 9105. "Instrument" is defined as:

> A negotiable instrument (defined in section 3104), or a security (defined in section 8102) or any other writing which evidences a right to payment of money and is not itself a ... lease and is of a type which is in the ordinary course of business transferred by ... assignment.

13 Pa.C.S.A. § 9105 (Purdon's 1984).

All of the assignment, assumption and indemnity agreements are basically the same. Assignor assigned to Debtor all of its rights and Debtor assumed all of the obligations arising out of the particular user lease. These agreements qualify as instruments and hence also are included among the chattel paper in this case. They evidence a right to payment of money in that the assignor assigned to Debtor the right to receive rental payments from the use-lessee pursuant to the terms of the equipment schedule. In addition, these agreements are the type of writing which normally would be transferred by assignment.

### B. *Possession of Chattel Paper*

Not only is the term "possession" not defined anywhere in the UCC, § 9305 does not specifically address a situation in which the chattel paper in question consists of multiple, co-equal originals, some of which are in the possession of the secured party, and some of which are in the possession of Debtor. Moreover, there do not appear to be any cases which address such a situation.

Unless they are displaced by particular provisions of the UCC, principles of law and equity shall supplement these provisions. 13 Pa.C.S.A. § 1103 (Purdon's 1984).

Certain Official Comments to various provisions of the UCC suggest that the type of possession required under § 9305 is analogous to that required under the common law of pledge. For instance, Official Comment 1 to § 9305 states that:

> *As under the common law of pledge,* no filing is required by this Article to perfect a security interest where the secured party has *possession* of the collateral. (Emphasis added.)

Numerous courts have recognized the relevance of the common law of pledge in construing the requirement of "possession" for purposes of § 9305. For instance, *see, In re Copeland,* 391 F.Supp. 134, 148 (D.Del.1975), *aff'd in part, vacated in part,* 531 F.2d 1195 (3rd Cir.1976):

> ... [A]s between the pledgor and the pledgee, the pledgee must maintain dominion and control over the property. Thus the rule is that no pledge is created if the pledgor or his agent retains possession of the collateral. *The authors of the Uniform Commercial Code adopted these aspects of the prior law of pledge [citing to § 9305 in n. 22].* (Emphasis added.)

See also, *Clarkson Co., Ltd. v. Shaheen,* 533 F.Supp. 905, 918 (S.D.N.Y.1982):

> ... [U]nless a putative secured party's possession of pledged instruments rises to the level of "actual and exclusive possession" *as required at common law,* his security interest has not been perfected. (Emphasis added.)

See also, *Cissel v. First National Bank of Cincinnati,* 476 F.Supp. 474, 490 (S.D.Ohio 1979):

> Under the U.C.C., a security interest may be perfected by possession (*akin to common law "pledge"*) as provided in § 9–305 ... (Emphasis added.)

■■■ A number of conditions must be met in order for there to be a pledge under the common law. The pledgor must relinquish possession of the property and unequivocally deliver it to the pledgee in such a way that the pledgee has absolute dominion and control over the property so as to absolutely deprive the pledgor of any control over it. *In re Dolly Madison Industries, Inc.,* 351 F.Supp. 1038, 1042 (E.D.Pa. 1972), *aff'd,* 480 F.2d 917 (3rd Cir.1973):

> It is fundamental to the existence of a pledge that the pledgor give up possession of his property and place it in the hands or control of the pledgee ... [T]he pledgee must have absolute dominion and control over the property.

See also, *Clarkson v. Shaheen, supra* at 917–18.

In addition, the possession must be such as to give *notice to others* of the existence of the pledge:

> In order to make a valid pledge ... there must be an actual or constructive delivery of the possession of the goods. The delivery must be clear, unequivocal, complete, and effective at all times *so as to give notice to third parties of the pledgee's rights.* (Emphasis added.)

*American Exchange Nat'l Bank of New York v. Federal National Bank of Pittsburgh,* 226 Pa. 483, 75 A. 683, 685 (1910).

The rationale for the requirement of exclusive possession and control of the pledged property by the pledgee is to prevent the pledgor from misleading a potential subsequent lender into believing that he is free to pledge that same property again:

> It was early held in that state [Pennsylvania] that the pledge of a chattel, without transfer of possession, was void as to bona fide purchasers, pledgees and execution creditors. *Clow v. Woods,* 5 Serg. & R., Pa., 275, 9 Am.Dec. 346. The rule was based upon the proposition that such persons are likely to be misled by the pledgor's retention of possession into the belief that he is entitled to deal with the chattel as his own.

*Taplinger v. Northwestern National Bank in Philadelphia (In re Mid–City Motor Sales, Inc.),* 101 F.2d 274, 276 (3rd Cir.1939).

This interpretation of the type of possession required under § 9305 of the UCC is supported by Official Comment 6 to 13 Pa.C.S.A. § 9205 (Purdon's 1984):

> The last sentence [of § 9205] is added to make clear that the section does not mean that the holder of an unfiled security interest, whose perfection depends on possession of the collateral by the secured party or by a bailee, ... can allow the debtor access to and control over the goods without thereby losing his perfected interest. *The common law rules on the degree and extent of possession which are necessary to perfect a pledge interest ... are not relaxed by this or any other section of this Article.* (Emphasis added.)

Additional support is also to be found in *Appeal of Copeland,* 531 F.2d 1195, 1203–04 (3rd Cir.1976); *See also, Heinicke Instruments Co. v. Republic Corp.,* 543 F.2d 700, 701–02 (9th Cir.1976).

Analysis of the distribution and retention of chattel paper in each of the twelve challenged leases leads to the conclusion that Chemical had perfected its security interests in Challenged Lease Nos. 1, 10, and 11 by virtue of its possessing the relevant chattel paper. Chemical did *not,* however, perfect its security interests in Challenged Lease Nos. 2–9 and 12 by possessing the relevant chattel paper.

The ultimate distribution and retention of relevant chattel paper as between Chemical and Debtor with respect to each of the challenged leases has been stipulated to. *See* Section I, *supra.* There are four (4) categories of distribution as between Chemical and Debtor. We will discuss them *seriatim.*

1) Challenged Lease Nos. 4, 7–9, and 12

 Chemical and Debtor retained essentially co-equal chattel paper in all of these challenged leases.

In Challenged Lease No. 4, both Chemical and Debtor possessed originals of the master lease and originals of the equipment schedule.

In Challenged Lease Nos. 7–9, and 12, Chemical possessed a certified copy while Debtor possessed a copy of the master leases. Neither of them possessed originals of the master leases because Debtor apparently had delivered all of them to other lending institutions which had financed prior equipment schedules related to them. (As was explained previously, the only salient difference between a certified copy and a copy was that the former was certified by Debtor to be a true and correct copy of an original of the master lease. Neither the certified copy nor the copy contained ink signatures, as did the originals.) In addition, both Chemical and Debtor possessed co-equal originals of the equipment schedules.

Chemical failed to perfect its security interests in these leases by virtue of its possessing the above chattel paper because it had not exercised absolute dominion and control over all available originals. Since Debtor had retained originals of these equipment schedules, Debtor *could* have offered its originals as collateral to another lender, who would *not* have been placed on notice that another lender had taken a prior security interest in the same lease collateral. The fact that Debtor did not possess an original of the master leases in Challenged Lease Nos. 7–9 and 12 would not have impaired its ability to offer its originals of these equipment schedules as collateral to a subsequent lender. It was not the practice in the industry to require one seeking financing for the purchase of computer equipment identified in an equipment schedule to deliver the original master lease along with the equipment schedule. Indeed, Chemical itself had financed eight (8) of the twelve (12) challenged leases at issue here *without* requiring Debtor to present an original of the master lease.

2) Challenged Lease Nos. 2 and 3

Both Chemical and Debtor possessed originals of the equipment schedules in Challenged Lease Nos. 2 and 3. In addition, Chemical possessed an original of the master leases whereas Debtor possessed only copies.

Chemical also failed to perfect its security interests in these leases because it had not exercised absolute dominion and control over all of the available original chattel paper. Debtor could have offered its originals of the equipment schedules as collateral to an unsuspecting subsequent lender. Debtor's lack of possession of all originals of the master leases would not have impaired its ability to offer its originals of the equipment schedules as collateral for the reason just set forth in connection with Challenged Lease Nos. 7–9 and 12.

3) Challenged Lease Nos. 5 and 6

Both Chemical and Debtor possessed originals of the equipment schedules in Challenged Lease Nos. 5 and 6. Chemical possessed certified copies while Debtor possessed copies of the master leases. In addition, Chemical possessed copies and Debtor possessed originals of the assignment, assumption and indemnity agreements.

The retention and distribution of chattel paper in these challenged leases is similar to that in Challenged Lease Nos. 7–9 and 12, with the exception that assignment, assumption and indemnity agreements were also involved.

Chemical failed to perfect its security interests in Challenged Lease Nos. 5 and 6 for the same reason that it failed to perfect its security interests in Challenged Lease Nos. 7–9 and 12. Debtor could have presented these equipment schedules as

collateral to an unsuspecting subsequent lender.

4) Challenged Lease Nos. 1, 10, and 11

 In Challenged Lease No. 1, Chemical possessed originals of the master lease and equipment schedule, while Debtor possessed only copies of both. In addition, both Chemical and Debtor possessed originals of the assignment, assumption and indemnity agreement.

In Challenged Lease Nos. 10 and 11, Chemical possessed certified copies of the master leases and originals of the equipment schedules while Debtor possessed copies of the master leases and the equipment schedules. In addition, Chemical possessed copies while Debtor possessed originals of the assignment, assumption and indemnity agreements.

The retention and distribution of chattel paper in these challenged leases differs in a significant way from that in all of the other challenged leases. Unlike all of the other challenged leases, Debtor did *not* possess originals of the equipment schedules for Challenged Lease Nos. 1, 10, and 11. It possessed only copies of them.

Debtor's possession of *original equipment schedules* in all of the other challenged leases is what accounted for its ability to offer them as collateral to a subsequent lender and for the lack of notice to the subsequent lender of a previous lender's security interests in the equipment schedules. Conversely, it would seem that Debtor's possession of *only copies of these equipment schedules* (rather than originals) ought to have *impaired* its ability to offer them as collateral to a subsequent lender and would have put a subsequent lender on notice that another lender already had a previous security interest in these equipment schedules.

Consequently, it follows that Chemical *did* perfect its security interest in these challenged leases by virtue of its possession of chattel paper pertaining to them. Debtor was deprived of indicia of ownership and control over these equipment schedules because it possessed only copies of them.

What really mattered in determining whether or not Chemical had perfected its security interests in all of the other challenged leases was whether or not Debtor possessed an original of the equipment schedules for that particular challenged lease. If Debtor possessed an original equipment schedule, then Chemical had not perfected its security interest by virtue of its possession of the chattel paper which it retained. If, on the other hand, Debtor did not possess an original equipment schedule, then Chemical had perfected its security interest by possession.

It is not relevant to determining the issue of perfection by possession of chattel paper whether or not Debtor possessed an original master lease. The same is no less true of the assignment, assumption and indemnity agreements. Debtor could not have offered *only* the assignment, assumption and indemnity agreement as collateral to a subsequent lender, especially in view of the fact that they make reference to unavailable, original equipment schedules. No responsible, subsequent lender could have been misled into accepting *only* these original assignment, assumption and indemnity agreements as collateral.

C. *Possession of the Rental Payments*

Debtor, in addition to granting Chemical security interests in the computer equipment and in all of its rights as lessor under the user leases, specifically granted Chemical security interests in the rental payments to which Debtor was entitled as lessor under the user leases. The rental payments were paid directly to Chemical by the user-lessees pursuant to the collateral assignments of lease and acknowledgements of assignment which were executed contemporaneously with the security agreements.

Collateral is defined as property, including chattel paper, which is subject to a security interest. *See* 13 Pa.C.S.A. § 9105 (Purdon's 1984). These rental payments were proceeds of the chattel paper. *Feldman v. Philadelphia National Bank*, 408 F.Supp. 24, 37 (E.D.Pa.1976), *citing Associates Discount Corporation v. Old Free-*

*port Bank,* 421 Pa. 609, 220 A.2d 621 (1966).

■ Chemical, in reliance upon the *Feldman* case, asserts that it perfected its security interests in the lease collateral pursuant to § 9305 by taking possession of the proceeds of the chattel paper. This assertion is without merit. This reliance is misplaced. *Feldman* does not stand for the proposition that a creditor may perfect a security interest in lease collateral by taking possession of the rental proceeds when it had not previously perfected its security interest in the underlying chattel paper. Rather, *Feldman* held only that the creditor had a *continuously* perfected security interest in rental proceeds *because* it had previously perfected its security interest in the *underlying* lease collateral. *Id.* at 38.

Furthermore, the rental payments at issue were transferred to Chemical by the user-lessees during either the 90–day preference period or the postpetition period. Perfection by possession *cannot* occur until such time as the secured party has taken possession of the collateral. "A security interest is perfected by possession *from the time possession is taken without relation back* and continues only so long as possession is retained...." (Emphasis added.) 13 Pa.C.S.A. § 9305 (Purdon's 1984). Accordingly, Chemical could not have perfected its security interests in the proceeds by possessing them until such time as the rental payments had been transferred to and received by it.

The rental payments which were transferred to Chemical during the 90–day prepetition preference period would, if all of the other essential elements are present, be avoidable as a preferential transfer pursuant to 11 U.S.C. § 547(b). Consequently, any purported perfection resulting from Chemical's possession of these rental payments must fail because the requisite transfer to it, out of which the purported perfection arose, would be avoidable. *See In re Arnold,* 21 U.C.C.Rep.Serv. 1479, 1485 (Bankr.W.D.Mich.1977) (applying 11 U.S.C. § 96 of prior Bankruptcy Act).

Similarly, any purported perfection resulting from Chemical's possession of the rental payments during the *post* petition period would be in violation of the automatic stay provision at 11 U.S.C. § 362(a)(4).

Chemical has put forth a number of arguments which, it claims, demonstrate that perfection by possession of the rental payments in this case was not in violation of 11 U.S.C. § 362(a)(4) and/or § 547(b). All of the arguments are without merit.

First, Chemical, citing § 9303(b) of the U.C.C., claims that it "continuously" perfected its security interests by taking possession of "... the stream of rental payments, as they became due, prior to ... [Debtor's] bankruptcy filing". Chemical opines that, since the various rental payments under a given user-lease succeeded one another, its security interest was "continuously perfected" and the effective time of perfection was when the first rental payment was received by it, presumably at a time beyond the reach of the Bankruptcy Code.

13 Pa.C.S.A. § 9303(b) (Purdon's 1984) provides as follows:

**Continuity of perfection.** *If* a security interest is originally perfected in any way permitted under this division and is subsequently perfected in *some other way* under this division, without an intermediate period when it was unperfected, the security interest shall be deemed to be perfected *continuously* for the purposes of this division. (Emphasis added.)

Chemical's reliance upon this provision is inappropriate. By its terms, § 9303(b) applies only where a security interest has been perfected *in different ways,* without an intervening time when it was not perfected. As shown earlier, Chemical had not previously perfected by some other means.

Chemical also argues that its perfection by possession of the postpetition rental payments was not in violation of 11 U.S.C. § 362(a)(4) because of 11 U.S.C. § 552(b).

■ Security interests in property acquired postpetition by a debtor or the estate are governed by § 552. In general, if

a prepetition security agreement is perfected, then property acquired by the debtor or the estate after commencement of the bankruptcy case is *not* subject to the security interest created by the prepetition security agreement. *See* 11 U.S.C. § 552(a).

The one exception to this general rule is set forth in 11 U.S.C. § 552(b), which provides as follows:

> Except as provided in sections ... 544 [or] ... 547 ... of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreements extends to property of the debtor acquired before the commencement of the case and to proceeds ... [or] rents ... of such property, then such security interest extends to such proceeds ... [or] rents acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law....

The application of § 552(b) is subject to certain limiting conditions. For instance, it applies only if the secured party has acquired a *valid, prepetition* security interest in the *underlying collateral* which subsequently produced the postpetition proceeds. *In re Schmidt*, 38 B.R. 380, 382–83 (Bankr.D.N.D.1984); *In re Smith*, 72 B.R. 344, 350 (Bankr.S.D.Ohio 1984) (§ 552(b) was not available with respect to proceeds because the underlying security agreement had not been perfected under the UCC.) As has been shown, Chemical did not have a valid, perfected prepetition security interest in the underlying collateral, i.e., the chattel paper, which produced the postpetition proceeds. Consequently, § 552(b) does not apply here.

▉ Finally, Chemical contends that postpetition perfection on its part by virtue of its possessing the rental payments was not in violation of the automatic stay in light of 11 U.S.C. § 362(b)(3), which creates an exception to the automatic stay when an interest in property is subject to perfection pursuant to 11 U.S.C. § 546(b).

Section 546(b) of the Bankruptcy Code provides in pertinent part that:

> The rights and powers of a trustee under sections 544 ... of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in the property before the date of such perfection.

Under this subsection, if an interest holder against whom the trustee would have rights still has, under applicable nonbankruptcy law, and as of the date of the filing of the petition, the opportunity to perfect a lien against an intervening interest holder, then the initial interest holder may perfect that interest against the trustee. Such perfection would antedate the filing of the bankruptcy petition. The purpose of this provision is to protect those whom state law would protect by permitting them to perfect *as of an earlier effective date. See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 371 (1977); *also*, S.Rep. No. 95–989, 95th Cong., 2d Sess, 86 (1978). In effect, this subsection permits postpetition perfection of a security interest if, under applicable nonbankruptcy law, such perfection can "relate back" to defeat the rights of an intervening creditor. *See* 4 *Collier on Bankruptcy* (15th ed. 1989) ¶ 546 at p. 11.

This final argument also fails because, under Pennsylvania law, no such relation back is possible in this case. The controlling provision is § 9305 which, as has been noted a number of times, expressly provides that perfection by possession occurs "... from the time possession is taken *without relation back* ..." (Emphasis added.)

## IV.

### STRONG–ARM PROVISION

11 U.S.C. § 544(a)(1) confers the status of hypothetical lien creditor upon the trustee. With certain exceptions not relevant here, a debtor-in-possession (including Debtor in this case) enjoys the same rights and powers as does the trustee. *See* 11 U.S.C. § 1107(a). Consequently, the status of hypothetical lien creditor also may be bestowed upon Debtor in this case.

■ Although the status of hypothetical lien creditor is conferred by federal law, the rights and powers with which a hypothetical lien creditor is endowed are determined by state law. *In re Bollinger Corp.*, 614 F.2d 924, 925 n. 1 (3rd Cir.1983); *In re Kravitz*, 278 F.2d 820, 822 (3rd Cir. 1960). A "lien creditor" is defined under Pennsylvania law as:

> ... a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes ... a trustee in bankruptcy from the date of the filing of the petition.

13 Pa.C.S.A. § 9301(c) (Purdon's 1984).

It was determined previously (See III. B., *supra*) that, as of the date on which Debtor had filed its petition in bankruptcy, Chemical had not perfected its security interests in the lease collateral in Challenged Lease Nos. 2–9 and 12, and that it had perfected in Challenged Lease Nos. 1, 10, and 11.

The status of a debtor-in-possession with the rights and powers of a lien creditor as against an unsecured creditor is set forth at 13 Pa.C.S.A. § 9301(a)(2) (Purdon's 1984), to wit:

> Except as otherwise provided in subsection (b), an unperfected security interest is subordinate to the rights ... of a person who becomes a lien creditor before the security interest is perfected.

■ Chemical, by virtue of its failure to perfect its security interests in the lease collateral in Challenged Lease Nos. 2–9 and 12, became an unsecured creditor with respect to these leases as of the date on which Debtor's bankruptcy petition was filed. *In re Stefko*, 34 U.C.C.Rep.Serv. 1434, 1440 (W.D.Pa.1982). Consequently, Chemical's rights with respect to Challenged Lease Nos. 2–9 and 12 are subordinate to those of Debtor and may be avoided pursuant to § 544(a)(1). *General Electric Credit Corp. v. Nardulli & Sons, Inc.*, 836 F.2d 184, 193 (3rd Cir.1988); *In re Dennis Mitchell Industries, Inc.*, 419 F.2d 349, 358 (3rd Cir.1969).

## V.

## PREFERENTIAL TRANSFERS

Several essential elements must be satisfied in order for a transfer of a debtor's property to be avoidable pursuant to 11 U.S.C. § 547(b). The transfer must have been: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while the debtor was insolvent; (4) made on or within 90 days of the filing of the petition, or within one year if the creditor was an insider at the time of the transfer; and (5) the creditor received more than he would have received had the case been brought under Chapter 7 of the Bankruptcy Code. *In re Gruber Bottling Works, Inc.*, 16 B.R. 348, 351 (Bankr.E.D. Pa.1982).

■ The rental payments at issue here constitute "transfers" under the Bankruptcy Code. Debtor's interest in the rental payments was disposed of when the user-lessees made payments directly to Chemical. *See* 11 U.S.C. § 101(50).

Each of the above essential elements is satisfied in this case with respect to these transfers.

All of the rental payments were made for the benefit of Chemical, which was a creditor of Debtor. *See* 11 U.S.C. § 101(9). The payments made pursuant to the aforementioned Notes and Agreements reduced Debtor's antecedent indebtedness to Chemical.

Debtor clearly had a negative net worth at the time of filing and was unable to meet its obligations as they became due. Debtor was insolvent at the time the transfers took place. *See* 11 U.S.C. § 101(31).

The payments which Debtor seeks to avoid were made during the 90–day period prior to the filing of the bankruptcy petition.

Finally, the transfers enabled Chemical to receive more than it otherwise would have received in a Chapter 7 liquidation case. Had Debtor's estate been liquidated, Chemical would have received only 2½% on each dollar of claim, rather than 100% on each dollar (as it in fact received).

None of the exceptions to a trustee's (or debtor's) avoidance powers which are set forth at 11 U.S.C. § 547(c) applies in this case.

Since all of the elements set forth at 11 U.S.C. § 547(b) for avoidance of a transfer have been satisfied and none of the exceptions set forth at 11 U.S.C. § 547(c) applies, Debtor is entitled to avoid all rental payments made directly to Chemical by the user-lessees during the 90–day period immediately prior to the filing of Debtor's bankruptcy petition on October 23, 1981, with respect to Challenged Lease Nos. 2–9, and 12.

The payments postpetition for these same challenged leases are also avoidable and must be returned to the Debtor as judgment lien holder since they were payments to an unsecured creditor clearly in excess of sums received by other unsecured creditors.

## VI.

### BENEFIT TO UNSECURED CREDITORS

Chemical has cited cases holding that lien avoidance under the strong-arm clause is intended solely for the benefit of creditors; lien avoidance will not be permitted where it benefits only the debtor and not any creditor. *In re Chapman*, 51 B.R. 663, 666–67 (Bankr.D.C.1985); *In re Vintero*, 735 F.2d 740, 742 (2nd Cir.1984).

Chemical has seized upon this apparent exception and argues that, even if Debtor were entitled to avoid the above security interests and transfers, any recovery by it would be a windfall for Debtor and thus is precluded by equity. According to Chemical, recovery by Debtor is *not necessary* in order for Debtor to be able to meet its obligations to unsecured creditors under the Plan of Reorganization, as Debtor presently has (and had even at the time of confirmation of the Plan) the ability to meet its obligations to, *inter alia*, unsecured creditors under the Plan. This argument is unsound for at least two (2) reasons.

First of all, Chemical relies upon the wrong standard for determining whether recovery by Debtor in this instance would benefit Debtor's unsecured creditors. According to Chemical, "the focus of the Court's inquiry is not whether a recovery *could* be used to pay other creditors, but on whether a recovery is *necessary* in order to make such payments. Where the debtor can meet its legal obligations to other creditors without any recovery from the unperfected secured (sic) creditor, equity will not permit a windfall recovery by the debtor." (Emphasis in original) (Chemical's Post–Trial Brief, p. 49.) Chemical takes the position that the relevant consideration is whether Debtor would be able to meet its obligations to the unsecured creditors in the absence of any recovery from Chemical. If it can, recovery by Debtor would not benefit the unsecured creditors and instead would be a windfall for Debtor.

■ This is not the appropriate standard for determining whether recovery by Debtor in this instance would benefit its unsecured creditors. The *necessity* of such recovery in order for Debtor to be able to meet its obligation to unsecured creditors is not relevant. What matters is whether unsecured creditors will receive "... some benefit from the recovery of the preferences, even if it is not an increase in the amount the creditors will receive". *In re Centennial Industries, Inc.*, 12 B.R. 99, 102 (Bankr.S.D.N.Y.1981). All that is required is that recovery by Debtor will increase its assets and improve its financial health to the extent that the likelihood is improved of its being able to satisfy its obligations to its creditors under the Plan. *In re Tennessee Wheel & Rubber Co.*, 64 B.R. 721, 724 (Bankr.M.D.Tenn.1986), *aff'd mem.*, 75 B.R. 1 (M.D.Tenn.1987), *citing, In re Southern Indus. Banking Corp.*, 59 B.R. 638 (Bankr.E.D.Tenn.1986).

■ The relevant standard has been met in this case. Recovery by Debtor will redound to the benefit of unsecured creditors in that recovery will improve Debtor's "financial health" by increasing its assets and therewith the likelihood that Debtor

will be able to meet its obligations under the Plan.

Also, even assuming that Chemical has correctly stated the standard for determining whether recovery by Debtor will inure to the benefit of its unsecured creditor, Chemical's claim that Debtor presently has (or had at the time the Plan was confirmed) the ability to meet its obligations under the Plan is not supported by the record.

Chemical is incorrect in asserting that Debtor had "sufficient value" at the time the Plan was confirmed in December of 1985 to make recovering from Chemical "irrelevant" to Debtor's ability to meet its obligations under the Plan. Debtor had, at the time of reorganization, total shareholders' equity of only $1.3 million after the infusion of $1 million in capital by Associates. In addition, Debtor at that time had a negative net worth of $44 million.

Chemical also is incorrect in asserting that Debtor presently has the financial means to meet all of its obligations under the Plan, without regard to any recovery by it from Chemical. Debtor presently has a negative cash flow of $900,000.00 per year. All of its assets which contribute to the present shareholders' equity of $13 million are restricted or encumbered by agreements with various lenders, except for $4.5 million in available cash. Debtor's present unrestricted assets are insufficient to redeem the preferred stock held by unsecured creditors. Moreover, use of any significant portion of available cash, without recovery from Chemical, would seriously jeopardize the success of Debtor's reorganization.

In short, the record indicates that recovery from Chemical is necessary in order for Debtor to meet all of its obligations to its unsecured creditors under the Plan of Reorganization.

## VII.

### CONCLUSION

Although Chemical did perfect its security interests in the lease collateral in Challenged Lease Nos. 1, 10, and 11, it did *not* perfect its security interests in Challenged

Lease Nos. 2–9 and 12. Consequently, Debtor will be permitted to avoid, pursuant to 11 U.S.C. § 544(a)(1), the transfers to Chemical as embodied in the Notes and Security Agreements and collateral Assignments of Lease in Challenged Lease Nos. 2–9 and 12. Debtor also will be permitted to avoid, pursuant to 11 U.S.C. § 547(b), the monthly rental payments made directly to Chemical by the user-lessees during the 90–day statutory period under Challenged Lease Nos. 2–9 and 12.

Debtor and Chemical have stipulated as to the amounts of the rental payments received by Chemical with respect to the twelve challenged leases, both during the 90–day statutory period and after Debtor filed its bankruptcy petition. The value of the transfers avoided by Debtor pursuant to 11 U.S.C. § 544(a)(1) is $4,793,879.86. The value of the transfers avoided pursuant to 11 U.S.C. § 547(b) is $388,476.34. The total value of the avoided transfers is $5,182,356.20. Judgment will be entered in this amount for Debtor and against Chemical.

An appropriate Order will be issued.

### ORDER OF COURT

AND NOW at Pittsburgh in said District this 12th day of March, 1990, in accordance with the foregoing Memorandum Opinion of this same day, it is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs Funding Systems Asset Management Corporation and F/S Computer Corporation may avoid, pursuant to 11 U.S.C. § 544(a)(1), the transfers to Defendants Chemical Business Credit Corporation, Chemcredit, Inc., and Chemlease Worldwide, Inc., as embodied in the notes and security agreements and collateral assignments of lease, in Challenged Lease Nos. 2–9 and 12. Plaintiffs also may avoid, pursuant to 11 U.S.C. § 547(b), the monthly rental payments made to Defendants under Challenged Lease Nos. 2–9 and 12.

IT IS FURTHER ORDERED that judgment is entered in favor of Plaintiffs Funding System Asset Management Corporation and F/S Computer Corporation and against Defendants Chemical Business Credit Cor-

poration, Chemcredit, Inc., and Chemlease Worldwide, Inc., in the amount of $5,182,-356.20, which is the amount of the above avoided transfers.